**TITAN INDEMNITY COMPANY,**
**Plaintiff,**

v.

**Jerry NEWTON, et al., Defendants.**

**No. Civ.A. 97–C–81–N.**

United States District Court,
N.D. Alabama,
Northern Division.

Feb. 11, 1999.

James R. Shaw, Paul F. Malek, Huie, Fernambucq & Stewart, Birmingham, AL, for Titan Indemnity Company.

Jerry Newton, Andalusia, AL, defendant pro se.

Stanley F. Gray, Fred David Gray, Jr., Gray, Langford, Sapp, McGowan, Gray &

Nathanson, Tuskegee, AL, Daniel M. Soloway, Daniel M. Soloway, PA, Pensacola, FL, for Robert Clyde Garland.

James A. Wardell, Suarez & Wardell, P.A., Tampa, FL, Bennie Lazzara, Jr., Wilkes & McHugh, Tampa, FL, for John Tatum.

## MEMORANDUM OPINION AND ORDER [1]

CARROLL, United States Magistrate Judge.

### I. INTRODUCTION AND PROCEDURAL HISTORY

This is a declaratory judgment action filed by Titan Indemnity Company (Titan) against Jerry Newton, Robert Garland and John Tatum.[2] In this action, Titan, an insurance company, asks the court to declare that it is not required by its contract of insurance with the City of Andalusia, Alabama, to pay a $2,300,000 judgment entered in favor of Garland and Tatum and against the City of Andalusia and Newton. Garland and Tatum filed counterclaims for breach of contract, bad faith and negligence.[3] The case is currently pending before the court on cross motions for summary judgment filed by Titan, Garland and Tatum.[4]

### II. FACTUAL BACKGROUND

On August 16, 1995, and November 27, 1995, respectively, Garland and Tatum filed suit against the City of Andalusia and several of its police officials, including Newton, who was head of the Narcotics Unit of the Andalusia Police Department, alleging that Newton had fabricated evidence against them which ultimately led to their conviction and imprisonment on federal drug charges. The cases were consolidated. Titan defended the city and all of its police officers, except Newton, unconditionally. Titan undertook Newton's defense under a reservation of rights. The case was ultimately sent to the jury on five claims. As the court described the claims in it's charge:

> Tatum and Garland have a total of five claims, consisting of three federal claims and two state claims. The three federal claims are (1) Garland's claim that Harrison failed to disclose exculpatory information to the prosecution, (2) Tatum's and Garland's claims that Newton and the City of Andalusia fabricated evidence, and (3) Tatum's and Garland's claims that Andalusia provided inadequate training and supervision to its police officers. The state law claims are (1) Tatum's and Garland's claims that Newton initiated a malicious prosecution against them, and (2) their claims that Newton falsely imprisoned them.[5]

The jury found for both plaintiffs and against the City of Andalusia on the failure to train and supervise claim, and against Newton on the fabricated evidence, malicious prosecution and false imprisonment claims. The jury charges containing the essential elements of each of the claims were as follows:

*Fabricated evidence claim*

Tatum and Garland claim that Newton fabricated evidence on the criminal pro-

---

1. The parties have consented to have the court exercise case-dispositive jurisdiction pursuant to the provisions of 28 U.S.C. § 636(c).

2. Newton filed an answer to the complaint, *pro se*. He filed no other pleadings or submissions and has not appeared at any of the hearings held in this case.

3. The proceedings on the counterclaims for bad faith and negligence have been stayed.

4. In deciding this case, the court has considered the motions for summary judgment, exhibits and briefs, including the supplemental authority provided by Titan on March 11, 1998.

5. Ultimately, the fabricated evidence claim against the City was not submitted to the jury.

ceedings against them. In order to prevail on this claim a plaintiff must prove by a preponderance of the evidence the following elements:

(1) That Newton fabricated evidence against the plaintiffs;

(2) That the evidence was material to bringing of criminal charge;

(3) That Newton acted intentionally; and,

(4) That Newton's conduct proximately caused injury to the plaintiff.

*Failure to train and supervise*

To prevail on a claim for failure to adequately train and supervise, a plaintiff must prove by a preponderance of the evidence the following elements:

(1) That Andalusia failed to adequately train and supervise its subordinate officers;

(2) That Andalusia acted with deliberate indifference to the plaintiff's constitutional rights; and

(3) That Andalusia's failure to train and supervise was causally related to Newton's fabrication of evidence.

*Malicious prosecution*

Both Tatum and Garland assert that Newton initiated a malicious prosecution against them. In order to prevail on a claim of malicious prosecution, a plaintiff must prove by a preponderance of the evidence the following elements:

(1) That Newton initiated judicial proceedings against the plaintiff;

(2) That Newton lacked probable cause for initiating the proceedings;

(3) That Newton acted with malice:

(4) That the termination of the judicial proceedings was in the plaintiff's favor; and

(5) that Newton's conduct was the proximate cause of the plaintiff's injury

*False imprisonment*

Tatum and Garland also claim that Newton falsely imprisoned them. In order to prevail in this claim, a plaintiff must prove by a preponderance of the evidence the following elements:

(1) that Newton unlawfully detained the plaintiff;

(2) that Newton lacked the probable cause for detention;

(3) That Newton acted intentionally; and

(4) That Newton's conduct was the proximate cause of the plaintiff's' injury.

The jury awarded Garland and Tatum each $350,000.00 in compensatory damages and $800,000.00 in punitive damages. Titan argues that it is not obligated to pay the verdict because the City of Andalusia's policy does not provide coverage for the claims giving rise to the verdict.

The contract of insurance between Titan and the City of Andalusia, as contained in the policy, obligates Titan to pay:

... all sums the insured must pay as damages because of personal injury or property damage to which this insurance applies caused by an occurrence resulting from law enforcement activities ...

The policy goes on to state in the definition of "insured" that the city is insured and "all law enforcement officers of the law enforcement agency," are insured when they act within the scope of their duties for the city. Thus, under the policy, the city is insured as are its police officers for actions taken within the scope of their duties as a law enforcement officers.

The policy also defines an occurrence as follows:

"Occurrence" means an event and includes continuous or repeated exposure to the same condition that results in:

1. Personal injury or property damage the insured did not expect or intend or

2. Personal Injury or property damage, although expected or intended by the insured, if an objectively good faith reason existed to cause such injury or damage.

"Personal injury" means:

1. Bodily injury. Any physical harm to a person's health including sickness or disease. This includes mental harm, mental anguish or mental illness whether or not there has been physical harm or illness.

2. False arrest, wrongful detention or imprisonment.

3. Unlawful prosecution . . .

    \*     \*     \*     \*     \*     \*

10. Violation of civil rights . . . [6]

The policy also contains other provisions relevant to the issues before the court.

PART III. WHAT THIS AGREEMENT COVERS

A. WE WILL PAY

1. We will pay all sums the insured legally must pay as damages because of personal injury or property damage to which this insurance applies caused by an occurrence resulting from law enforcement activities. This includes governmental action directed toward the prevention and control of crime in the course of public employment.

2. We have the right and duty to defend any claim, suit or action asking for these damages even if it is groundless or fraudulent. This includes but is not limited to inquests or civil and criminal suits brought under the Federal Civil Rights Act. . . .

### III. DISCUSSION

### A. RILEY I AND RILEY II

Titan is in the business of insuring governmental entities. In fact, Titan and the

City of Andalusia have had a long contractual relationship. The law enforcement policy at issue in this case is the offspring of a similar policy previously marketed and sold by Titan to other municipalities. In fact, the only differences between the policy at issue in this case and the policy previously marketed and sold by Titan are found in the definition of "occurrence" and in the definition of one of the categories of personal injury. In the previous policy, occurrence was defined as an event " . . . that results in personal injury the insured did not expect or intend unless the personal injury resulted from the use of reasonable force to protect persons or property." The previous policy thus excludes any coverage for intentional acts. The policy that is the subject of this litigation retains the definition of personal injury found in the previous policy and adds the following paragraph:

2. Personal injury or property damage, although expected or intended by the insured, if an objectively good faith reason existed to cause such injury or damage.

Also in the previous policy, one of the categories of "personal injury" was "malicious" prosecution. In the policy at issue in this case, "malicious" has been changed to "unlawful."

The previous Titan policy is the subject of two opinions by the Alabama Supreme Court, *Titan Indem. Co. v. Riley*, 641 So.2d 766 (Ala.1994) (Riley I) and *Titan Indem. Co. v. Riley*, 679 So.2d 701 (Ala. 1996) (Riley II). Riley I & II arose out of a lawsuit challenging the activities of the Montgomery City Police Vice and Narcotics Unit which contains claims similar to the claims pressed in the lawsuit which underlies this case. In Riley I, the Alabama Supreme Court summarized the factual background:

---

**6.** The policy contains other definitions of personal injury but none of those have any appli-

cation to this action.

In 1989 ... four (Montgomery City) police officers withdrew money from the informant fund and then falsely reported that they had spent it on "information" from "anonymous persons" regarding the alleged illegal drug activities of John Thomas Riley, Jr. Based on this fabricated "information" from these fictitious informants, the four policemen conducted an unconstitutional search of Riley's person and his automobile and filed criminal complaints against him without probable cause. They also "planted" false evidence in Riley's vehicle and supported Riley's criminal prosecution with false testimony. As a result, Riley was convicted on two counts of possession of crack cocaine with intent to distribute and once count of carrying a firearm during a drug transaction. He served approximately three years of a 123 month sentence, first in the Montgomery County jail and then in the federal penitentiary in Oakdale, Louisiana until his repeated habeas corpus proceedings ultimately exposed the unconstitutionality of his arrest and prosecution.

The United States District Court for the Middle District of Alabama vacated the judgments of conviction against Riley and ordered his release from prison and the United States attorney dropped all claims against him. Riley then sued the four police officers along with their supervisors .... and the City, alleging malicious prosecution and violations of his civil rights and seeking damages under 42 U.S.C. § 1983....

*Titan,* (Riley I), 641 So.2d at 767.

In Riley I, the Alabama Supreme Court was asked to review the decision of the state trial judge finding that Titan was required to defend the police officers who were sued in Riley's federal court action. Titan argued that their law enforcement liability policy did not cover intentional acts and that, therefore, Titan was not contractually obligated to defend police officers charged with intentional acts of conspiracy, perjury and falsification of evidence. The Alabama Supreme Court rejected Titan's argument concluding that the policy was ambiguous on its face. The court remarked

> The language of the policy does preclude coverage for intentional acts, but it also specifically provides coverage for acts of malicious prosecution, assault and battery, wrongful entry, piracy, and other offenses that require proof of intent. Further, the policy specifically provides coverage for claims brought under the Federal Civil Rights Act. The conflict between these provisions creates an inherent ambiguity within the policy, and it is well settled in this state that when there is any doubt as to whether insurance coverage exists under a policy, the policy must be construed for the benefit of the insured. (citations omitted).

*Id.* at 768.

The narrow holding in Riley I required Titan to defend the police officers charged in the case. When the case was remanded to the circuit court, the next round of arguments began. Titan, in this round of arguments, claimed that its policy of insurance did not require it to indemnify the police officers they were charged with representing if a jury returned a damage award. The trial court disagreed. On appeal, Titan argued that it was not required to indemnify the officers because the defendant police officers were not "insureds" within the meaning of that term in the policy "because the acts of the defendant officers as alleged in the federal complaint did not arise from law enforcement activities within the scope of the officers' duties for the city of Montgomery." *Titan,* (Riley II), 679 So.2d at 704. The Alabama Supreme Court rejected Titan's argument and concluded that Titan had a duty to indemnify under the terms of its policy. The court, however, did not engage in an in-depth analysis of the question of whether the officer were acting within the scope of their duties as law enforcement officers. It simply concluded

that Riley I was the law of the case and commanded the result which it reached.

## THE "SCOPE OF EMPLOYMENT" ISSUE

■ In the pending action, Titan argues, as it did before the Alabama Supreme Court in Riley II, that the activities of a police officer in fabricating evidence places the officer outside the policy because those acts are not activities within his duties as a law enforcement officer for the City of Andalusia. If Newton was not acting in the "scope of his employment" as a law enforcement officer when he fabricated evidence against Garland and Tatum, there is no coverage.

According to the evidence adduced in Garland's and Tatum's civil trial, Newton fabricated evidence against them in April 1991. At that time, Newton was a captain in charge of the Narcotics Unit of the Andalusia Police Department and was responsible for arresting and assisting in the prosecution of persons suspected of drug activity. Sometime in 1992, he admitted to a fellow officer, Tony Harrison, that he had planted the drugs to get a conviction against Garland and Tatum. Harrison testified in the civil trial about his conversation with Newton:

Q. Tell the jury what he said, sir.

A. (Harrison) On the way back, he stated that, "Do you know how we won the *Garland* and *Tatum* case?"

And I said, "No."

And he stated that, "Well, it wasn't nothing but sage and eggs, I took the marijuana and rubbed it in. Those S.O.B.'s weren't going to beat me. I do not play by their rules. It's hard for me to get this mixed up. I do not make the rules, I play by theirs."[7]

■ Under Alabama law, an employee's acts are within the scope of his employment if the acts are "so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Ex Parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala.1998) (*quoting* Prosser & Keeton, *The Law of Torts* (5th ed.1984)).[8] Of course, where an employee's behavior is "the result of, or impelled by, wholly personal motives," it cannot be said that the employee's actions are within the line and scope of his employment, *Koonce v. Craft*, 234 Ala. 278, 174 So. 478 (Ala.1937); *see also, Chamlee v. Johnson-Rast & Hays*, 579 So.2d 580 (Ala.1990).

■ Obviously, there are no bright line tests for determining when the actions of a law enforcement officer are within the scope of his duties as a law enforcement officer. There are, however, some benchmarks. On one end of the spectrum, it is clear that a police officer who sexually assaults someone whom he has arrested does not act within the line and scope of his authority. *See McLaren v. Imperial Cas. & Indem. Co.*, 767 F.Supp. 1364, 1367 (N.D.Tex.1991).[9] On the other hand, an officer who uses excessive force on a person in the course of an arrest does act within the scope of his duties as a law enforcement officer. *See McGhee v. Volusia County*, 679 So.2d 729 (Fla.1996) (Police officer who grabbed an arrestee by the throat and kicked him acted within the line

---

7. Trial testimony of Tony Harrison on November 5, 1996 at 27. (The transcript has been filed and is a part of the record in the underlying civil cases.)

8. In this case, jurisdiction is based on diversity of citizenship and Alabama law applies. *See Continental Graphic Services, Inc. v. Continental Cas. Co.*, 681 F.2d 743, 744 (11th Cir.1982).

9. There are other types of cases courts have found that an officer was not acting with the scope of his employment. *See e.g., Woodall v. City of Miami Beach*, 599 So.2d 231 (Fla.3d Dist.Ct.App.1992) (Police officer who, using excessive force, arrested a person in a bank teller's line with whom he had an altercation did not act within the line and scope of his authority).

and scope of his authority); *Daigle v. City of Portsmouth,* 129 N.H. 561, 534 A.2d 689, 699–701 (N.H.1987) (police officer who assaulted a theft suspect while officer was off duty acted in the scope of his employment); *Brungardt v. Barton,* 69 Or.App. 440, 685 P.2d 1021, 1023 (Ore.Ct.App.1984) (Police officer who assaulted the driver of a car while investigating a traffic violation acted within the scope of his employment); *Cheatham v. City of New Orleans,* 378 So.2d 369 (1979) (off duty police officers who were drinking and shot and killed an unarmed civilian who had intervened in an altercation between the police officers and a shoeshine boy were acting in the scope of their employment).

In the court's view, the actions of Newton in fabricating evidence against Garland and Tatum is far closer to a police officer's use of excessive force than it is to the sexual assault of an arrestee. There is no principled difference between fabricating evidence and using excessive force to summarily punish a suspect or to extract a confession. In addition, there is not one jot, speck or iota of evidence before the court from which it could be found or inferred that Newton was pursuing a private motive when he fabricated the evidence against Garland and Tatum. Indeed, the uncontradicted evidence before the court is that Newton fabricated the evidence as part of his duties to arrest and assist in the prosecution of drug dealers. As previously noted, Newton was in charge of narcotics enforcement for the City of Andalusia Police Department at the time of his unlawful action.

The parties differ on the effect that Riley II may have on this case. Titan argues that Riley II does not apply because the scope of employment issue was not addressed in the Riley II opinion. Garland and Tatum, on the other hand, contend that Riley II clearly states the position of the Alabama Supreme Court on the question of whether the an officer who fabricates evidence acts in the line and scope of his employment. The court agrees with

Garland and Tatum. The decision of the Alabama Supreme Court that there is a duty to indemnify in Riley II establishes that an officer who plants evidence acts in the scope of his employment as law enforcement officer. According to the opinion in Riley II, that issue was before the court. As the court noted

> Titan bases its arguments for reversal on two grounds. First, it contends that the defendant police officers are not "insureds" within the meaning of that term in the policy, because, it insists, "the acts of the defendant officers as alleged in the federal complaint did not arise from law enforcement activities within the scope of the officer's duties for the City of Montgomery."

*Titan,* (Riley II) 679 So.2d at 704. Had the court concluded that the planting of evidence was not in the scope of a police officer's employment, they could not have found that there was a duty to indemnify.

Even if this court is wrong and Riley II does not decide the issue, the outcome of this case is not different. It is clear to the court, from its review of the applicable law, that the Alabama Supreme Court, if confronted with this issue, would hold that Newton acted within the scope of his employment as a law enforcement officer, as that term is defined in the policy, when he fabricated the evidence against Garland and Tatum. Consequently, the court rejects Titan's argument that the "scope of employment" language in the policy has not been satisfied.

### THE AMBIGUITY ISSUE

▮ Under Alabama law,

[I]nsurance companies are entitled to have their policy contracts enforced as written, rather than risking their terms either to judicial interpretation or the use of straining language, and the fact that different parties contend for different construction does not mean that the disputed language is ambiguous.

*Woodall v. Alfa Mutual Ins. Co.*, 658 So.2d 369, 371 (Ala.1995) (*quoting Gregory v. Western World Ins. Co.*, 481 So.2d 878, 881 (Ala.1985)). However, also under Alabama law

> ... insurance contracts are to be considered "liberally in favor of the insured and strictly against the insurer," and exclusions from coverage contained in insurance policies are to be interpreted narrowly in order to provide for maximum coverage.

*United Services Auto. Asso. v. Vogel*, No. 2970194, 1998 WL 414480, at *2 (Ala.Civ. App. July 24, 1998) (*quoting Allstate Ins. Co. v. Skelton*, 675 So.2d 377, 379 (Ala. 1996)). The court in *Vogel* explained the policy underlying this rule.

> An insurance policy is written by the insurance company. Most insureds depend upon the company to provide the coverage they seek. When doubt exists whether coverage is provided, the language used by the insurer must be construed for the benefit of the insured. Likewise, where ambiguity exists in the language of an exclusion, the exclusion will be construed narrowly so as to limit the exclusion to the narrowest application reasonable under the wording.

*Vogel*, 1998 WL 414480, at *3 (*citations omitted*).

Garland and Tatum contend that the policy is ambiguous because the policy excludes coverage for intentional acts on the one hand but permits recovery for intentional acts on the other. As noted previously, the policy obligates Titan to pay for an "occurrence" resulting from law enforcement activities and defines an occurrence as an event which results in an unintentional personal or property injury or an intended injury "if an objectively good faith reason existed to cause the injury." The policy then goes on to define

personal injury as such things as false arrest, unlawful prosecution and violations of civil rights, all of which may involve an intentional injury. As previously noted, the Alabama Supreme Court has already found a policy very similar to the policy at issue in this case to be ambiguous based on this sort of conflicting language. In Riley I, the court noted

> The language of the policy does preclude coverage for intentional acts, but it also specifically provides coverage for acts of malicious prosecution, assault and battery, wrongful entry, piracy and other offenses that require proof of intent. Further, the policy specifically provides for coverage brought under the Federal Civil Rights Act. The conflict between these provisions creates an inherent ambiguity within the policy, and it is well settled in this state that when there is any doubt as to whether insurance coverage exists under a policy, the policy must be construed for the benefit of the insured.

(Riley I) 641 So.2d at 768 (*citations omitted*). The court went on to hold, "Because the policy is ambiguous on its face, we must construe it against Titan and conclude that Titan must defend the defendants on the claims against them." [10] *Id.*

A corollary to the ambiguity doctrine is the illusory coverage doctrine. Alabama recognizes this general law that the language or interpretation of an ambiguous provision by an insurance company may be so tortured as to result in "illusory" coverage. *See Industrial Chemical & Fiberglass Corp. v. Hartford Acc. & Indem. Co.*, 475 So.2d 472, 478–79 (Ala.1985). A recent decision by a Florida Appellate Court, styled *Purrelli v. State Farm and Cas. Co.*, 698 So.2d 618 (Fla.2d Dist.Ct.App. 1997), provides an excellent example of the application of the doctrine. In *Purrelli*, a

---

**10.** The decision of the Alabama Supreme Court is consistent with the decisions of other state courts on the issue. *See Davidson v. Cincinnati Ins. Co.*, 572 N.E.2d 502 (Ind. App.3d Dist.1991); *Stanback v. Westchester*

*Fire Ins. Co.*, 68 N.C.App. 107, 314 S.E.2d 775 (N.C.App.1984); *Levinson v. Aetna Cas. & Surety Co.*, 42 A.D.2d 811, 346 N.Y.S.2d 428 (N.Y.App.Div.2d Dept.1973).

chiropractor was sued for invasion of privacy for allegedly taking inappropriate videos of a female employee, who was also a patient, during treatment sessions. State Farm, the insurer sought a declaratory judgment that it was not required to provide coverage. In resolving the issue, the court was called upon to construe a personal umbrella liability policy which limited insurance coverage to "accidents" resulting in "personal injury." The policy defined personal injury to explicitly include "invasion of privacy and eleven other intentional torts although it also contained a provisions excluding personal injuries that were 'expected or intended' by the insured." It was, as the court noted, a policy that "purports to insure invasion of privacy, an intentional tort, but excludes acts "intended" by the insured and limits coverage to "accidents."" In concluding that there was coverage, the court noted

> The Maryland Court of Appeals held that conflicting provisions in a personal umbrella liability policy similar to Purrelli's could not be reconciled because the limitation and exclusion completely swallowed up the insuring provision creating the "grossest form of ambiguity." When limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory. As one court observed, an insurance policy that provides coverage for specifically enumerated intentional torts, but only if they are committed unintentionally is "complete nonsense."

*Id.* at 619 (*citations omitted*).

Titan responds to the Riley I opinion and the defendants' complaint about ambiguity by arguing that the definition of "occurrence" in this policy is different from the definition of occurrence in the policy at issue in "Riley I." Titan is correct, but the difference does not change the outcome. As Titan notes, the policy at issue in Riley I defined occurrence as an event that results in

1. Personal injury the insured did not expect or intend unless the personal injury resulted from the use of reasonable force to protect persons or property.

2. Property damage the insured did not expect or intend.

The policy then goes on to define "personal injury" as, *inter alia*, false arrest, malicious prosecution, assault and battery and violation of civil rights.

The policy at issue in this case defines occurrence as an event that results in

1. Personal injury or property damage the insured did not expect or intend, or

2. Personal injury or property damage, although expected or intended by the insured, if an objectively good faith reason existed to cause such injury or damage.

The policy then goes on to define "personal injury" in exactly the same way that the term is defined in the policy at issue in Riley I with one exception. In Riley I, one of the definitions of personal injury is "malicious prosecution." In the subsequent policy which is at issue in this case, "malicious prosecution" has been changed to "unlawful prosecution."

There is no question that the policies at issue in Riley I and this case are different. The policy in Riley I contained a blanket exclusion for intentional acts. The policy at issue in this case covers damages for personal injury or property damage caused by the intentional acts of the insured, "if an objectively good faith reason existed to cause such damage." The critical question to be asked is whether this change cures the ambiguity and the illusory coverage flaw. The court concludes that it does not because the term "objective good faith reason" is an inherently ambiguous term in the law enforcement liability context for coverage, both as to compensatory damages and punitive damages.

Titan offers no definition in the policy of what it means by "objectively good faith reason." Nonetheless, the term "objective good faith" is a term of art when a court is required to assess the constitutionality of law enforcement activi-

ty. The term first has significance in the case law surrounding search warrants and the so-called "good faith exception." That exception keeps evidence from being suppressed when law enforcement officers obtain evidence from objective good faith reliance on a facially valid warrant that is later found to lack probable cause. *United States v. Leon,* 468 U.S. 897, 913, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The so-called good faith exception has been extended to situations where officers are called upon to interpret or rely on an external source of authority such as a statute which later turns out to be invalid or not to authorize the action taken. *See, e.g., Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Williams,* 622 F.2d 830, 844 (5th Cir.1980) (*en banc*) and where officers have based their conduct on recognized exceptions to the warrant requirement itself. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

■■■ The term "objective good faith reason" also has significance when law enforcement officers are sued for damages under the federal Civil Rights Act, 42 U.S.C. § 1983. When a law enforcement officer is sued, he may raise the defense of qualified immunity. Under the doctrine of qualified immunity, a governmental actor, like a police officer, may be qualifiedly immune from a lawsuit for damages. As the law has developed, qualified immunity exists in virtually every case. In the words of the Eleventh Circuit:

> That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. Unless a government agent's act is so obviously wrong, in light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immuni-

ty shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994) (*citations omitted* ).

■■■ The qualified immunity doctrine in its present form was principally promulgated through the decision of the United States Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow,* the Supreme Court "purged the qualified immunity doctrine of its subjective components," *Mitchell v. Forsyth,* 472 U.S. 511, 517, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and "rejected the inquiry into the state of mind in favor of a wholly objective standard." *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). As the case law makes clear, the subjective good faith of the actor is irrelevant. The *Harlow* criteria is one of objective legal reasonableness rather than good faith. *Behrens v. Pelletier,* 516 U.S. 299, 305–306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

Despite the focus of the recent case law on objective reasonableness rather than subjective good faith as the critical issue, courts still occasionally refer to qualified immunity as objective "good faith" immunity. *See, e.g., Graham v. Connor,* 490 U.S. 386, 399 n. 12, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (. . . the officer's objective "good faith," that is whether he could have reasonably believe that the force used did not violate the Fourth Amendment, may be relevant to the availability of the qualified immunity defense to monetary liability under section 1983); *Harlow v. Fitzgerald,* 457 U.S. at 815, 102 S.Ct. 2727 (qualified immunity or "good faith" immunity is an affirmative defense); *Swint v. Wadley,* 51 F.3d 988, 994 (11th Cir.1995) (cases discussing qualified immunity sometimes refer to the doctrine of qualified "good faith" immunity); *D'Aguanno v. Gallagher,* 50 F.3d 877, 882 (11th Cir.1995) (attorneys fees even in actions for injunc-

tive and declaratory relief are barred when the defendant's conduct meets the objective good faith standard encompassed by the qualified immunity doctrine).[11]

It is clear to the court, based on a review of the applicable law, that the change in the policy to add coverage for intentional acts done with "an objective good faith reason" does not cure the ambiguity identified in Riley I. The policy at issue in Riley I sought to limit Titan's exposure by excluding intentional acts from the definition of occurrence. The Alabama Supreme Court concluded that policy was ambiguous because the policy specifically provided for coverage of intentional acts. The policy at issue in this case provides for coverage for injury which is the result of a violation of the Civil Rights Act that is intentional if an objectively good faith reason existed to cause such injury. That coverage is illusory and is, in reality, no coverage at all because of the availability of the qualified immunity defense. Although the precise focus of the qualified immunity defense is the objective reasonableness of a law enforcement officer's conduct in light of clearly established law, the court cannot conjure up a situation where a law enforcement officer would have an objectively good faith reason for causing an injury but not be qualifiedly immune. Consequently, there is no instance where a jury could return a verdict for which Titan would be required to provide indemnification if there was an objective good faith reason for the injury caused. For example, according to the decision of the Supreme Court in *Graham v. Connor*, 490 U.S. at 399 n. 12, 109 S.Ct. 1865, which concerns excessive force, a law enforcement officer is qualifiedly immune and could be not be subject to a damage award in an excessive force case where he acted in objective good faith. Likewise,

according to the decision of the Supreme Court in *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), a case involving the execution of search warrants, a law enforcement officer who has an objective good faith belief in the validity of a search warrant is qualifiedly immune and could not be subject to a damage award in a case involving an unconstitutional search and seizure. Under the terms of the policy, Titan is required to provide coverage for injury under the Civil Rights Act caused by an officer who had an objectively good faith reason to cause the injury. There is no such case which would result in a damage award. Thus, there is no civil rights case in which Titan will be required to pay. The coverage is classically illusory.

The same is true concerning the coverage for state law claims. The policy covers unlawful prosecution and false imprisonment claims if an objectively good faith reason existed for the false imprisonment or unlawful prosecution. The court is hard pressed to envision a hypothetical case, and Titan has not presented such a case to the court, where a law enforcement officer is assessed damages for false imprisonment and unlawful prosecution as the result of objective good faith actions. If there are such cases, they are few and far between.

■ The punitive damages provision of the policy is also ambiguous. The City of Andalusia has contracted with the Titan to provide coverage for payment of a punitive damages award.[12] However, under well-settled federal law, punitive damages in a federal civil rights case are authorized only where the jury finds that the defendant was motivated by an evil motive or intent, or where he acted with reckless or callous indifference to federally protected rights.

---

11. As of April 26, 1994, county and municipal law enforcement officers have been given immunity under state law, much like the qualified immunity under federal law. *See generally Sheth v. Webster*, 137 F.3d 1447 (11th Cir. 1998).

12. Punitive damage coverage is excluded by the normal policy language in Titan's law enforcement liability policy. However, Titan and the City of Andalusia, by amendment, deleted the punitive damages exclusion from the policy.

*Anderson v. City of Atlanta,* 778 F.2d 678, 688 (11th Cir.1985) (*citing Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Likewise, under Alabama law, a punitive damage award for an intentional tort like malicious prosecution or false imprisonment may be awarded only where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice in regard to the plaintiff. ALA. CODE § 6–11–20(a). Titan has agreed to provide the City of Andalusia with coverage for punitive damages arising out of intentional acts but has limited the coverage to those occurrences of injury where there is a "an objectively good faith reason" for causing such injuries. It is clear, however, under the applicable state and federal law that punitive damages can never be awarded if there is an objectively good faith reason for the action. Thus, under the terms of this policy, Titan will never be required to indemnify a punitive damages award.

The policy at issue in this case purports to provide compensatory and punitive damages coverage for "violations of civil rights" and for several intentional torts but limits the coverage to cases where there is an objectively reasonable basis for causing the injury. The limitations of this policy completely swallow up the insuring provisions. There are, at worst, no such cases and, at best, a miniscule number.

In response to the questions raised by the court at oral argument about the intersection of the qualified immunity defense and the "objective good faith reason" language of the policy, and thus, the possibility of illusory coverage, Titan has argued in its brief that the policy may be illusory in some fashion but not so illusory that the court should compel coverage. Titan contends that there are instances where coverage is provided to the City and the court agrees.[13] The policy does provide some coverage for the municipality. In the core area of misconduct by its officers, it does not appear that there is any coverage as Titan interprets the policy for jury damage awards, either compensatory or punitive, for violations of the federal Civil Rights Act or for intentional torts committed by those law enforcement officers although the policy purportedly covers such awards.

## THE PUBLIC POLICY ARGUMENT

Titan also argues that providing coverage for the fabrication of evidence is against public policy. Titan concedes that the decision in Riley II makes it clear that parties may agree to cover intentional acts. In a recast version of the argument, Titan claims that it is against public policy to provide coverage for criminal acts.[14] The argument is based, in part, on this court's opinion in *Horace Mann Ins. Co. v. Fore,* 785 F.Supp. 947 (M.D.Ala.1992). In *Fore,* the insurance company sought a declaratory judgment to determine whether it was required to defend and indemnify in a civil action a former teacher who had been convicted of child molestation. In resolving the issue in favor of the insurance company, the court concluded that public policy compelled the result. In *Fore,* the court dealt with the sexual molestation of a child by a teacher who was subsequently convicted of a crime and its holding is necessarily limited to those facts. More importantly, if the court's holding could somehow be construed to be broader, it cannot be used for the proposition that public policy somehow prohibits coverage in this case. It is clear to the court that the public policy issue has been resolved by the Alabama Supreme Court in Riley II where one of the issues was, as here, the

13. Plaintiff Titan Indemnity Company's Second Supplemental Brief in Support of its Motion for Summary Judgment filed October 23, 1998 at 7–8.

14. This argument is made briefly in the last brief filed by Titan but made more fully in the brief filed on March 11, 1998 styled "Submission of Additional Authority in Support of Defendant Titan's Motion for Summary Judgment."

fabrication of evidence. Although the court was not asked to answer the question concerning the public policy aspects of coverage of criminal acts, its holding, under the facts of Riley II, implicitly answers the question. It would be a twist of the law to construe Riley II as saying that there is coverage for fabrication of evidence but only if the fabrication does not break the law.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1. That the motion for summary judgment filed by Titan Indemnity on January 5, 1998 seeking a declaratory judgment in its favor be DENIED; and

2. That the motions for summary judgment on the breach of contract counterclaim filed by Robert Clyde Garland on December 23, 1997 and John Tatum on December 30, 1997 be GRANTED.

A declaratory judgment in favor of Garland and Tatum will be entered accordingly.