USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1642

 CENTRAL INTERNATIONAL COMPANY,

 Plaintiff, Appellant,

 v.

 KEMPER NATIONAL INSURANCE COMPANIES,
 AMERICAN MOTORISTS INSURANCE COMPANY,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Morris E. Lasker, U.S. District Judge]

 Before

 Selya, Boudin and Lynch,
 
 Circuit Judges.
 
 
 
 
 Edmund M. Pitts with whom Pitts & Pitts was on brief for
appellant.
 David Y. Loh with whom Marcigliano & Campise was on brief for
appellees.

January 24, 2000

 
 

 BOUDIN, Circuit Judge. This marine insurance case, which
turns on the meaning of an exclusion for "discoloration and
corrosion," begins with an ocean shipment made in December 1995. 
At that time, the plaintiff-appellant, Central International
Company ("Central")--a trading company doing business in
Massachusetts--arranged for the transportation of galvanized steel
coils from Aviles, Spain, to a customer in St. Vincent, West
Indies, aboard the M/V Andrealon. The shipment was insured under
an "all risk" ocean marine open cargo insurance policy previously
issued to Central by the principal defendant-appellee, American
Motorists Insurance Company ("AMICO"). The policy was not limited
either to this shipment or to steel products.
 The vessel in question encountered heavy seas en route to
St. Vincent, resulting in damage to the vessel and its hatches. It
is apparently undisputed that the steel coils in question were in
good condition when shipped but arrived in damaged condition. The
laboratory analyses conducted on the damaged cargo showed that the
coils were "severely corroded" and displayed a variety of light and
dark stains. The initial direct loss, independent of consequential
damages, was estimated by Central at several hundred thousand
dollars.
 Central then brought suit on its insurance policy in a
Massachusetts trial court seeking approximately $221,000 in damages
to the coils plus additional related expenses. For simplicity, we
treat AMICO as the only defendant. AMICO removed the case to
federal district court on the ground that it fell within that
court's admiralty or maritime jurisdiction, 28 U.S.C. 1333(1). 
In due course, both sides moved for summary judgment. In April
1999, the district court filed a decision granting AMICO's motion
for summary judgment and ordering dismissal of the complaint.
 The district court pointed out that the policy covered
all risks of "physical loss or damage [to the cargo] from any
external cause" but was subject to a specific exclusion:
 However, as respects steel products and all
 metals: excluding rusting, oxidation,
 discoloration and corrosion; also excluding
 bending, twisting, crimping, and end damage.

Since corrosion and discoloration were the admitted damage, the
district court found that the policy exclusion applied. The court
rejected Central's effort to avoid the exclusion by saying that the
corrosion and discoloration had not occurred naturally but had been
primarily caused by water and by the improper stowage of powder
ash, which had allegedly leaked onto the steel coils during the
storm or otherwise. Central now appeals.
 Our review of a summary judgment is de novo, EEOC v.
Green, 76 F.3d 19, 23 (1st Cir. 1996), and we begin with the choice
of law. Suits on maritime insurance policies are classic examples
of matters within federal maritime jurisdiction, see Gilmore &
Black, The Law of Admiralty 1-10, at 22 n.71 (2d ed. 1975)
(citing Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1 (1871)). 
Accordingly, Central's brief says that such contracts are "subject
to general admiralty law when there is an established federal rule
and by state law when there is not." AMICO purports to agree but
says that there is enough federal precedent in analogous cases to
make Massachusetts law irrelevant.
 Beneath this surface agreement on general principles lies
an abyss of confusion. One might think that construing a maritime
insurance policy, in relation to damage occurring on the high seas,
would be a paradigm case for a uniform body of federal law, see
Gilmore & Black, supra, 1-17, at 49. But the tensions in Supreme
Court precedents are legendary, both with regard to the reach of
state law in federal maritime law generally and its effect on cases
initially brought in state court under the saving to suitors
clause. Since Massachusetts law in the end is no better for
Central than any federal precedent cited to us, we (like the
district court) need not pursue the matter.
 Turning to the merits, Central must accept in light of
its own affidavits that the harm to the steel coils manifested
itself as corrosion and discoloration. Conversely, at least for
purposes of this appeal, we must assume the truth of Central's
claim that the anterior cause of the corrosion and discoloration
was the exposure of the steel to improperly stowed powder ash as
well as to sea water and that unexpected storm conditions at sea
contributed to that exposure. See Green, 76 F.3d at 21. The case
thus involves a generally covered risk (actually, two risks: sea
peril and negligent stowage) resulting in excluded consequences
(corrosion and discoloration).
 This is a recurring issue and, under ordinary principles
of contract interpretation, there is little doubt that the
exclusion is presumptively a qualification on the risk coverage. 
Normally, specific language is treated as a limitation on general
language; and in this case fixing the relationship of the two
clauses is made even easier because the all-risk language in
Central's policy is followed by the term "[h]owever," which
introduces the exclusion. In other words, facially read, there is
liability for damage to cargo from all risks including storm or
accident unless the damage is corrosion or discoloration. 
 Curiously, this straightforward approach is not always
reflected in the cases. There is language, in Massachusetts
decisions as elsewhere, that purports to treat a covered risk and
an excluded consequence as legitimate rivals whose priorities are
to be tested by asking questions about "causation"; these
discussions, often in opinions with defensible results, tend not to
be very illuminating. See Keeton & Widiss, Insurance Law 5.5(c),
(d) (Practitioner's ed. 1988). The better explanation, where the
insurer is held liable, appears to be that the court has chosen to
read the exclusion in context more narrowly than its literal
language might suggest.
 A good example in Massachusetts is Standard Elec. Supply
Co. v. Norfolk & Dedham Mut. Fire Ins. Co., 307 N.E.2d 11 (1973),
where water from a burst pipe leaked into and damaged the basement
of an adjoining building; the policy on the latter building
generally covered physical damage but specifically excluded water
damage in various specified forms (e.g., flood, underground
seepage). Yet recovery was allowed, seemingly because the court
thought the exclusion in context was directed at natural flooding
or seepage and not that resulting from an accidentally burst pipe. 
307 N.E.2d at 12-13. What is confusing is the court's reliance,
later in the opinion, on an alleged "well established principle"
that recovery is allowed "where the insured risk [caused] . . . an
excepted risk." Id. at 13.
 The smattering of authority for this "well-established"
principle is not very impressive, see, e.g., 5 Appleman & Appleman,
Insurance Law and Practice 3083, at 311 (1970) (discussing fire
insurance), and the cases usually--but perhaps not always, see
Jussim v. Massachusetts Bay Ins. Co., 610 N.E.2d 954, 955-58 (Mass.
1993)--can be better explained as a limiting construction of the
exclusion. The attempt to give priority to the initial covered
cause in the "train of events" over the excluded consequence is
doubtful in principle even where the covered risk is narrowly
defined (e.g., fire), but it becomes absurd where the initial
coverage is all risk, since every excluded harm has some cause.
 Still, there is nothing wrong with reading policy
language more narrowly (or broadly) than its literal wording might
at first suggest where this better captures the reasonable
expectation of the parties--the central object of all contract
interpretation. See 1 Corbin, Contracts, supra, 1.1, at 2; see
also Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047,
1052 (1st Cir. 1993). Courts have made such adjustments on a range
of bases, including not only surrounding language or other specific
evidence of the parties' intent but also--to a surprising extent--
the common-sense intuition of judges as to what the parties likely
had in mind. Although the readings often favor the insured,
implied exceptions to coverage are not unknown. See Keeton &
Widiss, supra, 5.3(a), (c).
 In this case, Central does make a pair of colorable
arguments for a narrowing interpretation of the exclusion. The
first is that the exclusion should apply only to naturally
occurring corrosion or discoloration, say, as a result of exposure
to salt air, and not to that produced by a fortuitous event like
storm exposure or negligent stowage of adjacent cargo. This is not
an impossible interpretation, cf. Standard, 307 N.E.2d at 12-13--an
insurer might specially wish to prevent such liability for natural
corrosion--but, of course, there is nothing in the policy to
suggest such a limitation, and at least two further arguments exist
against it.
 One is that some authority exists for excluding natural
deterioration of shipped goods from coverage without a specific
exclusion, see Keeton & Widiss, supra, 5.3(c), which would make
the express exclusion from corrosion redundant if it were read so
narrowly. The other is that the full exclusion in this policy
includes some excluded harms (e.g., bending of the steel) that
could rarely occur "naturally" in a voyage, so Central's argument
implies that one part of the exclusion is subject to an implicit
limitation that could not be applied to the other part--hardly a
natural reading.
 Central's other argument for coverage is that unless the
exclusion were read narrowly, the protection offered for steel
shipments would be empty; its premise is that the only foreseeable
damage to steel on a sea voyage would be discoloration, corrosion
or some form of physical distortion covered by the above-quoted
"bending" clause of the exclusion. We agree that a reading of a
policy that entirely nullified meaningful protection would raise
doubts that the parties intended that reading. E.g., Titan Indem.
Co. v. Newton, 39 F. Supp. 2d 1336, 1344-45 (N.D. Ala. 1999);
Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 298 (R.I. 1999).
 Yet it is not true that all maritime loss as to steel
would trigger the literal language of the exclusion; if the ship
sank in deep water, the inability to recover the cargo would create
a covered loss without regard to any corrosion or discoloration
that might ensue. Further, this policy was "open," embracing
various kinds of cargo that Central might ship on different
voyages; the failure to provide much protection for steel did not
render the policy generally useless. And it appears from the
policy that the exclusion could have been modified, although
perhaps not to provide unlimited coverage for steel, by payment of
a higher premium.
 As for case law, neither side has cited us to maritime
law cases that are closely in point, but there is no reason to
believe that on this issue maritime law would differ from the
ordinary application of contract rules customarily applied by state
courts in insurance cases. However, Massachusetts case law does
offer a number of examples, including the burst pipe case described
above, which are somewhat helpful to Central--even beyond their
support for the view (with which we agree) that the presumptive
literal reading is not always the one that prevails.
 But the precedent most closely in point from
Massachusetts--whose law Central wants to govern this case--cuts
the opposite way. In Bettigole v. American Employers Insurance
Co., 567 N.E.2d 1259 (Mass. App. Ct. 1991) (Kaplan, J.), the Court
held that an insurance policy exclusion for "corrosion" negated
coverage where the supporting steel in a parking facility
deteriorated after exposure to ice, water and de-icing salts
carried in by cars, id. at 272-73; the court rejected the insured's
claim that the true "cause" was the "release of chloride ions,
which was not named as an excluded risk, with the corrosion
following as a consequence," id. at 275.
 We cite Bettigole primarily because its facts are apt and
not because we attach conclusive weight to Massachusetts case law
construing a particular policy. The Supreme Court's intermittent
resort to state law to resolve maritime law issues usually involves
not random state-law precedents but something closer to an
affirmative state policy, typically in cases involving local
maritime matters (e.g., coastal or inland waterways). Gilmore &
Black, supra, 1-17. Thus, there may be no compulsion here to
treat state precedent as binding rather than merely instructive,
cf. Southworth Mach. v. F/V Corey Pride, 994 F.2d 37, 41 (1st Cir.
1993), but Bettigole is certainly instructive.
 Central has also sought review of the district court's
refusal to allow Central leave to amend in order to add a very
large claim for consequential damages over and above the value of
the coils. Since we affirm the district court's reading of the
exclusion, such an amendment would be futile; whether or not
consequential damages are consistent with maritime law, they can
hardly be awarded under this policy to offset the further
consequences of an expressly excluded loss.
 The judgment is affirmed. AMICO's motion for damages and
double costs is denied.