<u>Baltimore City Police Department, et al. v. Ivan Potts</u>, Misc. No. 6, September Term, 2019; <u>Mayor and City Council of Baltimore v. Estate of William James, By Its Personal Representative, Menyonde Lewis</u>, No. 51, Sept. Term, 2019

**LOCAL GOVERNMENT TORT CLAIMS ACT – MD. CODE ANN., CTS. & JUD. PROC. (1974, 2013 REPL. VOL.) § 5-303(b)(1) – SCOPE OF EMPLOYMENT – ACTIONS BY LAW ENFORCEMENT OFFICERS –** In two cases, Court of Appeals held that former members of Baltimore City Police Department's Gun Trace Task Force acted within scope of employment. Court of Appeals concluded that stipulations of fact, which described actions by law enforcement officers, established that officers' conduct satisfied test for conduct within scope of employment set forth in Court's case law. Officers' conduct in both cases was analogous to cases in which Maryland appellate courts have determined that government employees acted within scope of employment. Under Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) § 5-303(b)(1), which is part of Local Government Tort Claims Act, Mayor and City Council of Baltimore and Baltimore City Police Department are responsible for compensating plaintiffs for officers' actions by paying settlements that plaintiffs and officers reached.

United States District Court for the District of Maryland
Case No. 8:16-cv-03187-CBD

Circuit Court for Baltimore City
Case No. 24-C-19-002784

Argued: February 10, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 6

September Term, 2019

_____

BALTIMORE CITY POLICE DEPARTMENT, ET AL.

v.

IVAN POTTS

_____

No. 51

September Term, 2019

_____

MAYOR AND CITY COUNCIL OF BALTIMORE

v.

ESTATE OF WILLIAM JAMES, BY ITS PERSONAL REPRESENTATIVE, MENYONDE LEWIS

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Wilner, Alan M. (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: April 24, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the instant cases, we must decide whether certain actions by law enforcement officers were within the scope of their employment.[1] The officers involved were members of the Baltimore City Police Department ("the Department")'s now-defunct Gun Trace Task Force. A few years ago, in a shocking and unfortunate scandal, it was discovered that members of the Department's Gun Trace Task Force had engaged in what has been described as "a wide-ranging, years-long racketeering conspiracy," which resulted in the officers being prosecuted and convicted in the United States District Court for the District of Maryland. The instant cases do not involve the facts underlying the federal prosecutions. Rather, the cases arise out of two instances of police misconduct, in which the officers conducted stops and made arrests without reasonable articulable suspicion or probable cause, that were not charged in the federal conspiracy.

Under the Local Government Tort Claims Act ("the LGTCA"), Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) ("CJ") §§ 5-301 to 5-304, generally, "a local government [is] liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." CJ § 5-303(b)(1). The LGTCA does not define "scope of

---

[1]In this Court, in <u>Balt. City Police Dep't, et al. v. Ivan Potts</u>, Misc. No. 6, Sept. Term, 2019, and <u>Mayor and City Council of Balt. v. Estate of William James, By Its Personal Representative, Menyonde Lewis</u>, Case No. 51, Sept. Term, 2019, the Mayor and City Council of Baltimore and the Baltimore City Police Department filed identical consent motions to consolidate the oral arguments, and this Court granted the motions. Although the cases have not been formally consolidated, we issue one opinion due to the similarity of the facts and applicable law.

Although the Department is not a party to <u>James</u>, we will refer to assertions by "the City and the Department" in both <u>Potts</u> and <u>James</u>, as the City's contentions in <u>James</u> are almost identical to the City's and the Department's arguments in <u>Potts</u>.

employment," but Maryland case law provides an explanation of the term. In <u>Sawyer v. Humphries</u>, 322 Md. 247, 255, 587 A.2d 467, 470 (1991), this Court explained that there is a two-pronged "general test" for whether an employee acted within the scope of employment ("the <u>Sawyer</u> test"). The first prong of the <u>Sawyer</u> test is whether the employee's actions "were in furtherance of the employer's business[,]" and the second prong is whether the employer "authorized" the employee's actions. <u>Id.</u> at 255, 587 A.2d at 470.

In <u>Potts</u>, the officers stopped Ivan Potts, Appellee, without reasonable articulable suspicion as he was walking, beat him, searched him, and found no contraband. Having found no contraband, the officers planted a handgun on Potts, arrested him, and falsely stated in police reports that he had possessed the handgun. The officers did not steal or take anything of value from Potts. At Potts's trial, the officers falsely testified that they had recovered the handgun from him. Potts was convicted and sentenced to eight years' imprisonment, the first five of which to be served without the possibility of parole, and he was incarcerated at various Maryland State prison facilities until his conviction was vacated. From the time of Potts's arrest to his release, he was in custody approximately nineteen months. In the United States District Court for the District of Maryland, Potts sued the officers and the Department, Appellant, and later the Mayor and City Council of Baltimore ("the City"), Appellant.[2]

In <u>James</u>, officers stopped William James's vehicle without reasonable articulable

---

[2]The City and the Department constitute local governments for the LGTCA's purposes. <u>See</u> CJ § 5-301(d)(4), (d)(21).

suspicion and demanded that James provide the name of a person who possessed drugs or a gun. When James was unable to do so, the officers falsely alleged that a handgun, that they had provided, belonged to James and arrested him. The officers did not steal or take anything of value from James. James was in custody awaiting trial for more than seven months. After his release from custody, in the Circuit Court for Baltimore City, James sued the officers, the Department, and the City, Petitioner. During the proceedings in the circuit court, James died in an incident that was unrelated to the civil case. James's estate, Respondent, replaced him as the plaintiff.

In both cases, the plaintiffs and the officers agreed to a settlement of the lawsuits in the amount of $32,000 for the plaintiffs. As part of the settlements, the officers assigned to Potts and James's estate the right to indemnification from the City under CJ § 5-303(b)(1) and the collective bargaining agreement between the Department and its officers' union.[3] Potts and James's estate filed supplemental complaints in their respective cases, seeking payment of the settlements by the City. In both cases, in connection with motions for summary judgment, the parties entered into a "Stipulated Statement of Undisputed Material Facts" ("the stipulation").

In Potts, while motions for summary judgment were pending in federal court, the parties filed a joint motion to certify a question of law to this Court, which the United States

---

[3]The Memorandum of Understanding between the Department and the Baltimore City Lodge No. 3, Fraternal Order of Police, Inc. Unit I, states in pertinent part: "The City will provide indemnification to any member of the [Department] who is made a defendant in litigation arising out of acts [that are] with[in] the scope of [] employment that results in a monetary judgment being rendered against the employee."

District Court for the District of Maryland granted. In <u>James</u>, the circuit court granted James's estate's motion for summary judgment, finding that the officers acted within the scope of employment and that the City was required to compensate James's estate. The City appealed, and petitioned for a writ of *certiorari* while the case was pending in the Court of Special Appeals. The certified question of law in <u>Potts</u> and the question presented in the petition for a writ of *certiorari* in <u>James</u> are identical, and state:

> Whether, . . . in light of the undisputed facts in the record, the three former Baltimore City Police officers [who are] named in this action are entitled to indemnity for the judgments [that were] entered against them herein; that is, whether, as matter of law[,] on the undisputed facts, the judgment [that was] sought to be enforced by [the p]laintiff is based on "tortious acts or omissions [that were] committed by the [officers] within the scope of [their] employment with [the City]."

(Quoting CJ § 5-303(b)(1)) (some alterations in original) (emphasis omitted). This Court accepted the certified question of law in <u>Potts</u>, and granted the petition for a writ of *certiorari* in <u>James</u>. See <u>Mayor & City Council of Balt. v. Estate of James by Lewis</u>, 466 Md. 309, 219 A.3d 526 (2019).

Before us, the City and the Department contend that the officers' actions were outside the scope of employment as their actions were outrageous, personally motivated, and willfully criminal. Potts and James's estate respond that the officers acted within the scope of employment as there is no evidence that the officers personally benefitted from their actions—*i.e.*, the officers' actions were designed to further the interests of the Department, not the officers.

We conclude that the stipulations in <u>Potts</u> and <u>James</u> establish that the officers' conduct in each case satisfies the test for conduct within the scope of employment that this

Court set forth in <u>Sawyer</u>, 322 Md. at 255-57, 587 A.2d at 470-71.  The officers' conduct in <u>Potts</u> and <u>James</u> is analogous to conduct in cases in which Maryland appellate courts have determined that government employees acted within the scope of employment.  As such, we hold that, in <u>Potts</u> and <u>James</u>, the officers acted within the scope of employment, and, under CJ § 5-303(b)(1), the City is responsible for compensating Potts and James's estate for the officers' actions by paying the settlements that Potts, James's estate, and the officers reached.

Evaluating the first prong of the <u>Sawyer</u> test, we conclude that the officers' actions were in furtherance of the Department's business as their actions were at least partially motivated by "a purpose to serve the" Department, and because there is no indication that the officers were "acting to protect [their] own interests[.]"  <u>Sawyer</u>, 322 Md. at 255-57, 587 A.2d at 470-71 (citations omitted).  Our conclusion is supported by the well-established principle in Maryland case law that, generally, an officer's arrest of a person is within the scope of employment.  <u>See</u> <u>Sawyer</u>, 322 Md. at 260, 587 A.2d at 473.  Although it is despicable that the officers stopped Potts and James without reasonable articulable suspicion and arrested them based on fabricated evidence, these circumstances alone do not render it inconceivable that the officers were acting within the scope of their employment.  The stipulations in <u>Potts</u> and <u>James</u> contain no indication that the officers took or received anything of value from Potts or James, or were otherwise serving their own personal interests in making the arrests.  The officers' misconduct in <u>Potts</u> and <u>James</u> is distinguishable from their conduct in the conspiracy for which they were prosecuted in federal court.  In contrast to the circumstances here, in furtherance of the federal

- 5 -

conspiracy, in incidents that did not involve Potts or James, the officers seized money and drugs and kept the money and drugs for themselves and, as a result, were charged with racketeering. The lack of evidence of any personal benefit that the officers received from their conduct in these cases leads to a determination that, in arresting Potts and James, the officers were acting at least in part in furtherance of the business of the Department.

In assessing the second prong of the Sawyer test, it is plain that the Department did not authorize (and, in fact, expressly forbade) the officers' misconduct involving Potts and James—which included disregarding a lack of reasonable articulable suspicion for the stops, planting handguns, beating Potts, making false statements in police reports, and testifying falsely at trial. In Sawyer, id. at 256, 587 A.2d at 471, though, this Court set forth ten factors for determining whether an employee's actions were incidental to those that the employer authorized and thus within the employee's scope of employment. Here, weighing the ten factors set forth in Sawyer leads to the conclusion that the officers' conduct was incidental to conduct that the Department authorized. Although the Department clearly did not authorize the officers' misconduct, and indeed their conduct violated the Department's "express . . . orders[,]" under the factors set forth in Sawyer, the officers' actions were "incident[al] to the performance of the duties" that the Department entrusted to them, and those actions did not render the officers' overall conduct outside the scope of employment. Id. at 255, 587 A.2d at 470 (cleaned up).

## BACKGROUND

### Potts

The following information is derived from the stipulation in Potts.

- 6 -

On September 2, 2015, in Baltimore City, Potts began walking from his home to a grocery store. Evodio Calles Hendrix, Wayne Earl Jenkins, and Maurice Kilpatrick Ward exited an unmarked Department vehicle and stopped Potts. At the time, Hendrix, Jenkins, and Ward were on-duty officers of the Department and members of the Department's Gun Trace Task Force. The officers lacked reasonable articulable suspicion for the stop or probable cause to believe that Potts had committed, or was committing, a crime. To the contrary, at all relevant times, Potts was not breaking any law.

Potts declined to consent to a search of his person. The officers became angry, slammed Potts to the ground, and kicked him. One of the officers beat Potts with a police baton. The other two officers made no effort to stop the beating. Potts was injured, and started bleeding. The officers handcuffed Potts and searched his person, but did not find any contraband. One of the officers produced a handgun that Potts had never seen before. Jenkins tried to put the handgun in Potts's hands so that his fingerprints would get on it. Potts resisted. Ward and Hendrix punched and kicked Potts again. Potts suffered a large gash on his leg, bruises on his ribs, and injuries to his head. The Department's booking unit declined to accept Potts until after the officers took him to a hospital for treatment. The stipulation does not indicate that any of the officers took or received anything of value from Potts.

The officers authored police reports in which they falsely stated that Potts had a handgun on his person when they arrested him. The officers did so to prevent Potts from being released on bail, and to encourage prosecutors to charge him. In the circuit court, the State charged Potts with handgun-related crimes. At Potts's trial, the officers falsely

testified that they had recovered a handgun from Potts. On March 2, 2016, a jury convicted Potts. The circuit court sentenced Potts to eight years of imprisonment, the first five of which to be served without parole. Potts remained imprisoned until April 12, 2017. On that date, the circuit court vacated Potts's convictions on a motion by the State's Attorney for Baltimore City.

## **James**

The following information is derived from the stipulation in James.

On August 18, 2016, in Baltimore City, James was driving his vehicle, in which his girlfriend was a passenger. Two Department vehicles cut in front of James's vehicle, forcing him to pull over. Jenkins, Jemell Lamar Rayam, and Marcus Roosevelt Taylor were inside the Department vehicles. At the time, Jenkins, Rayam, and Taylor were on-duty officers of the Department and members of the Department's Gun Trace Task Force. The officers lacked reasonable articulable suspicion for the stop or probable cause to believe that James had committed, or was committing, a crime. When the officers pulled James over, neither he nor his girlfriend were breaking any law.

Taylor exited one of the Department vehicles, approached James's vehicle, and pulled him out. Taylor told James that he would let James go if James provided the name of a person who possessed guns or drugs. James said he did not know any such person, and could not provide any names. Rayam advised James's girlfriend that James would be imprisoned for possession of a gun. The officers huddled around their vehicles. When they finished, Jenkins produced a gun that did not belong to James and said: "This is your gun right here." The officers arrested James and took him to the Baltimore City Central

- 8 -

Booking & Intake Center. The stipulation does not indicate that the officers took or received anything of value from James.

In the circuit court, the State charged James with handgun-related crimes. James was ordered to be held without bail. James remained imprisoned until March 24, 2017. On that date, the State entered a *nolle prosequi* as to the charges against him. As a result of being imprisoned for more than seven months, James lost his job and time with his six-year-old son, and his home went into foreclosure.

**The Federal Prosecutions**

The following information concerning the federal prosecutions is derived from parts of the stipulations in Potts and James that are identical. On or about February 27, 2017, the Office of the United States Attorney for the District of Maryland charged the five officers who were involved in Potts and/or James (Hendrix, Jenkins, Rayam, Taylor, and Ward), as well as two other former members of the Department's Gun Trace Task Force (Momodu Bondeva Kenton Gondo and Daniel Thomas Hersl). The seven officers were charged in connection with what the stipulations in Potts and James called "a wide-ranging, years-long racketeering conspiracy[.]" On or about August 24, 2017, the Office of the United States Attorney for the District of Maryland charged Thomas Allers, another former member of the Department's Gun Trace Task Force, in connection with the conspiracy.

Hersl and Taylor were found guilty at a joint trial. Allers, Gondo, Hendrix, Jenkins, Rayam, and Ward pled guilty. The stipulations in Potts and James contained excerpts from the plea agreements, which stated that each of these six officers admitted that he and the other officers had the goal of "violating the legitimate purposes of the [Department] in

order to enrich themselves through illegal conduct, including extortion[ and] robbery[.]" According to the stipulations in <u>Potts</u> and <u>James</u>, the crimes to which Allers, Gondo, Hendrix, Jenkins, Rayam, and Ward pled guilty, as well as the crimes of which Hersl and Taylor were found guilty, "demonstrate actions[,] omissions[,] and various forms of conduct that grossly depart from any authorized or legitimate police conduct."  "The underlying actions comprising the criminal acts described in the indictments and plea agreements failed to serve any legitimate purpose of the City's or [the Department]'s business as a municipal government entity or the principal public safety agency of that government[,] or did so only coincidentally."

The stipulations in <u>Potts</u> and <u>James</u> state: "The actions of the [officer]s were performed during[,] and in furtherance of[,] their outrageous criminal conspiracy[,] and in pursuit of their own pecuniary self-interests."  "The [officer]s purposefully and willfully and regularly deviated from the legitimate law enforcement aims of the [Department]'s mission [] to enrich themselves through the illegitimate and illegal conduct."  "The [officer]s accomplished this by concealing their illegitimate and illegal conduct from City officials and from their superiors."  "The [officer]s would sometimes intentionally avoid attending . . . scheduled court proceedings [that were] related to individuals [whom] they had falsely arrested so as not to be questioned regarding their illegal activity of extorting and robbing citizens and fabricating evidence against such falsely arrested persons."  "The [officer]s conspired with each other and coached each other in order to better lie to internal investigators to cover up and conceal their wrongdoing."

The stipulations state that the federal prosecutions of the officers were exclusively

based on incidents that involved victims of the conspiracy—*i.e.*, individuals other than Potts and James. Neither Potts nor James was interviewed by federal investigators or prosecutors, or called as a witness at Hersl's and Taylor's trial. No event involving Potts or James was included in any stipulation of fact, plea agreement, pre-sentence report, or other document in connection with the federal prosecutions of the officers.

The stipulations in <u>Potts</u> and <u>James</u> include descriptions of twenty-eight incidents involving victims of the federal conspiracy. According to the stipulations, the officers who pled guilty admitted under oath that they had participated in the twenty-eight incidents. According to the stipulations, the parties included the twenty-eight incidents to "demonstrate the [officer]s' illegal, illegitimate[,] and egregious criminal conduct[,] and craft a vivid picture of the nature[,] character[,] and duration of the conspiratorial agreement into which all [of] the [officer]s knowingly and willfully entered[.]"

Each of the twenty-eight incidents occurred when the officers were members of the Department's Gun Trace Task Force. In each incident, some of the officers seized cash, drugs, and/or other personal property that had belonged to a person with whom they interacted. The officers kept some or all of the cash and drugs for themselves, rather than submitting all of the cash and drugs at the Department's headquarters as evidence. The officers either failed to author a police report, authored a police report that did not mention the seizure, or authored a police report that understated the amount of cash that the officers had seized. We summarize three of the incidents to illustrate the nature and extent of officers' crimes.

On September 7, 2016, Gondo, Hersl, Rayam, Taylor, and Ward stopped a person

with the initials S.S.[4] as he was trying to leave a storage facility's parking lot. Taylor falsely told S.S. that the officers had a search warrant for S.S.'s storage unit. Hersl, Jenkins, and Rayam went into S.S.'s storage unit, seized a sock that contained $4,800, and removed $2,000. Rayam gave the sock to S.S. and told him to leave. The stipulations in Potts and James characterized the officers' actions involving S.S. as "robbery and extortion[.]" The officers failed to author a police report regarding the officers' encounter with S.S., and failed to submit any portion of the $2,000 to the Department's headquarters as evidence. In other words, the officers kept the $2,000 for themselves.

On July 8, 2016, Gondo, Hersl, Jenkins, and Rayam went to the residence of a person whose initials were R.H. and asked him where he kept his cash. R.H. responded that he kept his cash in a bedroom. The officers seized $20,000 from R.H.'s residence. Jenkins told R.H. that, if he provided the name of a drug dealer whom the officers could rob, the officers would "take care" of R.H., and possibly provide him with drugs to sell. The stipulations in Potts and James do not indicate how, if at all, R.H. responded. Rayam authored a police report regarding the officers' encounter with R.H., and failed to disclose that the officers had seized $20,000 at his residence. In other words, the officers stole the $20,000 from R.H.'s residence.

On March 22, 2016, Hendrix, Jenkins, Taylor, and Ward initiated a traffic stop of a vehicle that a person with the initials O.S. had been driving. During the traffic stop, the officers seized $21,500, drugs, and a key to O.S.'s residence. The officers learned O.S.'s

---

[4]The victims of the conspiracy are referred to by their initials.

home address by looking at his driver's license. Hendrix authored a police report that falsely stated that the officers had seized $15,000 from O.S. during the traffic stop. As Hendrix's supervisor, Jenkins approved the police report. The officers submitted only $15,000 at the Department's headquarters as evidence, and kept the remaining $6,500 for themselves. At some point after the traffic stop, the officers entered O.S.'s residence and stole $200,000 and at least two kilograms of cocaine. Jenkins gave the drugs to a third party to sell with the understanding that Jenkins would get the sale's proceeds. The officers did not author any police reports regarding their seizure of cash and cocaine at O.S.'s residence.

## DISCUSSION

### The Parties' Contentions

The City and the Department contend that the officers engaged in outrageous, personally motivated, and willfully criminal acts that were outside the scope of their employment. The City and the Department argue that the officers' actions against Potts and James were neither in furtherance of the business of, nor authorized by, the Department. The City and the Department maintain that the officers' actions involving Potts and James were in furtherance of the criminal conspiracy prosecuted in federal court. The City and the Department contend that it would thwart the LGTCA's purpose—of providing assistance to those harmed by local government employees who are acting in good faith—to allow officers to commit crimes, be convicted, and force the City to pay for the crimes.

James's estate responds that, even if the officers' actions were intentional,

outrageous, and criminal, those actions were within the scope of employment. According to James's estate, the plain language of the LGTCA does not preclude such conduct from falling within the scope of employment as the statute indicates that a local government shall be liable for tortious acts or omissions committed by an employee within the scope of employment. Potts argues that the officers' actions were authorized by, and designed to further the interests of, the Department. Potts asserts that the record does not show that the officers arrested him for personal reasons—*e.g.*, to obtain money or cover up their other crimes—or that there is evidence that the officers personally benefitted from their actions. Potts maintains that, even if the officers were motivated by personal reasons, they had additional motivations as well—namely, advancing the Department's interest in showing the public that it was fighting gun violence. Potts and James's estate contend that having the City compensate them would serve the LGTCA's purposes of ensuring that victims have a remedy and encouraging local governments to prevent abuses of power.

### Standard of Review

An appellate court reviews without deference a trial court's grant of a motion for summary judgment, "review[s] the record in the light most favorable to the nonmoving party[,] . . . and construe[s] any reasonable inferences that may be drawn from the facts against the moving party." Kennedy Krieger Inst., Inc. v. Partlow, 460 Md. 607, 632-33, 191 A.3d 425, 440 (2018) (citation omitted). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and [] the [moving] party is entitled to judgment as a matter of law." Md. R. 2-501(a).

## The LGTCA and the Term "Scope of Employment"

CJ § 5-302(b), which is part of the LGTCA, governs judgments against local governments' employees, stating in pertinent part:

(1) Except as provided in paragraph (2) of this subsection, a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government.

(2)(i) An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice.

(ii) In such circumstances the judgment may be executed against the employee and the local government may seek indemnification for any sums it is required to pay under [CJ] § 5-303(b)(1)[].

CJ § 5-303(b)(1) governs local governments' liability for their employees' torts, stating: "Except as provided in subsection (c) of this section,[5] a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."

Although the LGTCA does not define "scope of employment," Maryland case law explains the term. Some Maryland cases that address the term "scope of employment" involve the LGTCA. See, e.g., Ennis v. Crenca, 322 Md. 285, 291, 587 A.2d 485, 488 (1991); Wolfe v. Anne Arundel Cty., 374 Md. 20, 27, 821 A.2d 52, 56 (2003). Other Maryland cases that address the term "scope of employment" involve the doctrine of

---

[5]CJ § 5-303(c) governs judgments against local governments or their employees that include punitive damages. CJ § 5-303(c) is not relevant here because the instant cases do not involve punitive damages.

*respondeat superior*, under which an employer is liable for an employee's actions that are "within the scope of [] employment." Cox v. Prince George's Cty., 296 Md. 162, 164-65, 460 A.2d 1038, 1039 (1983) (citation omitted); see, e.g., Prince George's Cty. v. Morales, 230 Md. App. 699, 702, 149 A.3d 741, 742 (2016).

Sawyer, 322 Md. at 254, 587 A.2d at 470, which involved the Maryland Tort Claims Act ("the MTCA"), Md. Code Ann., State Gov't (2014) ("SG") §§ 12-101 to 12-110, is a particularly significant Maryland case that addresses the term "scope of employment." Under the MTCA, generally, State personnel are immune for actions that are "within the scope of the public duties of the State personnel[,] and [are] made without malice or gross negligence[.]" SG § 12-105; CJ § 5-522(b). In Sawyer, 322 Md. at 254, 587 A.2d at 470, this Court explained: "Although this Court has never discussed in detail whether the phrase 'scope of the public duties' in the [MTCA] is coextensive with the common[-]law concept of 'scope of employment' under the doctrine of respondeat superior, we have treated them as the same." (Citations omitted). In other words, the term "scope of the public duties" within the MTCA is "synonymous with 'scope of employment' for purposes of respondeat superior[.]" Id. at 254, 587 A.2d at 470.

Although Sawyer involved the MTCA, in multiple subsequent cases that involved the LGTCA, this Court relied on Sawyer when discussing or applying the term "scope of employment." In Ennis, 322 Md. at 293-94, 587 A.2d at 489-90, which involved the LGTCA, this Court referred to Sawyer multiple times when explaining the term "scope of employment." In Wolfe, 374 Md. at 34, 821 A.2d at 60, which also involved the LGTCA, we held that it was "clear from our cases that [an officer] was not acting within the scope

- 16 -

of [] employment[,]" and we relied on <u>Ennis</u>, 322 Md. at 293-96, 587 A.2d at 489-91, and <u>Sawyer</u>, 322 Md. at 254-60, 587 A.2d at 470-73.

In <u>Morales</u>, 230 Md. App. at 717, 149 A.3d at 751, which involved the doctrine of *respondeat superior*, the Court of Special Appeals relied on <u>Sawyer</u> when discussing the term "scope of employment." The Court of Special Appeals observed that, because the term "scope of the public duties" within the MTCA is "'synonymous with "scope of employment" for purposes of *respondeat superior* liability,'" cases applying the MTCA have precedential value in cases like" <u>Morales</u>—*i.e.*, cases involving the doctrine of *respondeat superior*—"insofar as they involve scope of employment." <u>Morales</u>, 230 Md. App. at 717 n.3, 149 A.3d at 751 n.3 (quoting <u>Sawyer</u>, 322 Md. at 254, 587 A.2d at 470). In sum, where government employees' actions have been at issue, this Court and the Court of Special Appeals have treated as synonymous the term "scope of employment" within the LGTCA, the term "scope of the public duties" within the MTCA, and the term "scope of employment" for purposes of the doctrine of *respondeat superior*. As such, we will discuss relevant Maryland case law addressing issues as to the scope of employment under the LGTCA, the MTCA, and the doctrine of *respondeat superior*.

In <u>Cox</u>, 296 Md. at 164, 171, 169, 460 A.2d at 1039, 1043, 1042, this Court held that a trial court erred in dismissing a complaint,[6] where the plaintiffs' allegations—

---

[6]In <u>Cox</u>, 296 Md. at 165, 460 A.2d at 1039, the trial court "sustained [a] demurrer[,]" which is "[a] pleading stating that[,] although the facts [that are] alleged in a complaint may be true, they are insufficient for the plaintiff to state a claim for relief[.] . . . [] In most jurisdictions, such a pleading is now termed a *motion to dismiss*[.]" *Demurrer*, Black's Law Dictionary (11th ed. 2019) (italics in original). We refer to the demurrer in <u>Cox</u> as "a motion to dismiss."

namely, that county law enforcement officers detained their son by having a police dog bite him, and that the officers beat their son—were not inconsistent with the officers having acted within the scope of employment for purposes of the doctrine of *respondeat superior*. The plaintiffs sued the officers and the county for false arrest and other causes of action. See Cox, 296 Md. at 164, 460 A.2d at 1039. In seeking dismissal, the county contended that, under the doctrine of *respondeat superior*, the officers' actions were outside the scope of employment. See id. at 164-65, 460 A.2d at 1039. The trial court granted the motion to dismiss, the plaintiffs appealed, and the Court of Special Appeals affirmed. See id. at 165, 460 A.2d at 1039.

> This Court reversed and remanded for further proceedings, explaining:
>
> An act may be within the scope of the employment, even though forbidden[,] done in a forbidden manner, or consciously criminal or tortious. . . . [T]he simple test for determining vicarious liability under the principle of *respondeat superior* is whether they were acts within the scope of [] employment; not whether they were done while prosecuting the [employer]'s business, but whether they were done by the [employee] in furtherance thereof, and were such as may fairly be said to be authorized by [the employer]. . . . A[n employer] is subject to liability for the intended tortious harm by a[n employee] to the person or things of another by an act [that was] done in connection with the [employee]'s employment, [even ]though the act was unauthorized, if the act was not unexpectable in view of the duties of the [employee].

Id. at 170-71, 460 A.2d at 1042 (cleaned up). We observed that the county argued that, according to the plaintiffs' allegations, the officers were acting maliciously and intentionally, and therefore outside the scope of employment. See id. at 171, 460 A.2d at 1043. We reiterated, however, that an employer "may be held liable for the intentional torts of [an employee] where the [employee]'s actions are within the scope and in

furtherance of the [employer]'s business and the harm complained of was foreseeable." Id. at 171, 460 A.2d at 1043. We concluded that the plaintiffs' allegations met these criteria and were sufficient to survive the motion to dismiss. See id. at 171, 460 A.2d at 1043.

In Sawyer, 322 Md. at 260-61, 250-52, 587 A.2d at 473-74, 468-69, this Court held that a trial court erred in granting a motion to dismiss where two plaintiffs, who were involved in an altercation with an off-duty State trooper, brought an action against the trooper alleging assault and battery. This Court held that part of the conduct alleged in the complaint—namely, that the trooper threw rocks at the vehicle that the plaintiffs were in and beat one of the plaintiffs—did not constitute actions within the "scope of public duties" under the MTCA. See id. at 251, 257, 260, 587 A.2d at 468, 472, 473. But, this Court concluded that whether or not other actions taken by the trooper on the same day during a second encounter—namely, hitting one of the plaintiffs, announcing that he was a law enforcement officer, and having the plaintiff arrested—were within the scope of employment should not have been decided on a motion to dismiss. See id. at 251-52, 260-61, 587 A.2d at 469, 473-74. In the alternative, this Court also held that the trooper would not be entitled to immunity because the allegations in the complaint sufficiently alleged malice. See id. at 261-62, 587 A.2d at 474.

One of the plaintiffs was driving on a State highway in a vehicle, in which the other plaintiff was a passenger. See id. at 250, 587 A.2d at 468. The defendant, an off-duty officer of the Maryland State Police, was wearing civilian clothes and driving his personal vehicle on the State highway. See id. at 250, 587 A.2d at 468. The defendant's vehicle was in front of the plaintiffs' vehicle. See id. at 250, 587 A.2d at 468. The defendant made

- 19 -

hand signals and pulled over to the side of the State highway, allowing the vehicle that the plaintiffs were in to pass. See id. at 250, 587 A.2d at 468. The plaintiffs drove down a side road to a construction site and returned to the State highway. See id. at 250, 587 A.2d at 468. At that time, the defendant was leaning against his vehicle, which was parked on the side of the State highway. See id. at 250, 587 A.2d at 468. The defendant motioned for the plaintiffs to approach him. See id. at 250, 587 A.2d at 468. The defendant picked up some rocks and threw one at the plaintiffs' vehicle, making a large dent in the passenger side. See id. at 251, 587 A.2d at 468.

The driver of the plaintiff's vehicle parked and got out, intending to speak with the defendant about the damage to his vehicle. See id. at 251, 587 A.2d at 468. The defendant picked up more rocks. See id. at 251, 587 A.2d at 468. The driver picked up an empty beer bottle, intending to defend himself. See id. at 251, 587 A.2d at 468. The defendant grabbed the driver by the hair, beat him, and threatened to kill him. See id. at 251, 587 A.2d at 468. The plaintiff who was in the passenger seat exited the vehicle, intending to help the driver. See id. at 251, 587 A.2d at 468. The defendant let go of the driver, stepped toward the other plaintiff, and said: "[U]nless you want some too, [] you better get back in the car." Id. at 251, 587 A.2d at 468. Both of the plaintiffs got back in their vehicle. See id. at 251, 587 A.2d at 468. The defendant approached the vehicle that the plaintiffs were in and offered to exchange information. See id. at 251, 587 A.2d at 468. The plaintiffs declined to do so and drove away. See id. at 251, 587 A.2d at 468.

Later the same day, the defendant's vehicle began following the vehicle that the plaintiffs were in. See id. at 251, 587 A.2d at 468. The vehicle that the plaintiffs were in

stopped at a stop sign. See id. at 251, 587 A.2d at 468. The defendant exited his vehicle, approached the passenger side of the plaintiffs' vehicle, and slapped one of the plaintiffs across the chest. See id. at 251, 587 A.2d at 468-69. The defendant said that he was an officer of the Maryland State Police, and that he was arresting the plaintiff. See id. at 251, 587 A.2d at 469. The plaintiffs did not believe that the defendant was a law enforcement officer, and repeatedly asked him for identification, which the defendant refused to provide. See id. at 251, 587 A.2d at 469. The defendant tried to remove the plaintiff whom he had slapped from his vehicle, but was unable to do so because his seat belt was fastened. See id. at 251, 587 A.2d at 469. Eventually, other law enforcement officers arrived and arrested the plaintiff. See id. at 251-52, 587 A.2d at 469.

During the lawsuit, the defendant filed a motion to dismiss, contending that, under the MTCA, he was immune because he acted within the scope of his public duties and without malice. See id. at 252, 587 A.2d at 469. The trial court granted the motion to dismiss, the plaintiffs appealed, and the Court of Special Appeals affirmed. See id. at 253, 587 A.2d at 469.

This Court reversed and remanded for further proceedings. See id. at 262, 587 A.2d at 474. This Court noted that an employee's actions are within the scope of employment where "they [are] in furtherance of the employer's business and [are] authorized by the employer." Id. at 255, 587 A.2d at 470 (internal quotation marks omitted). As to furtherance of the employer's business, the question is "not whether [the employee's actions] were done while prosecuting the [employer]'s business, but whether they were done by the [employee] in furtherance thereof[.]" Id. at 255, 587 A.2d at 470 (citation

omitted).  As to authorization by the employer, the question is not whether the employer

"expressly conferred" on the employee the authority to take the actions, "but whether the

act[ions were] incident[al] to the performance of the duties [that were] entrusted to [the

employee] by the [employer], even though in opposition to [the employer's] express and

positive orders."  Id. at 255, 587 A.2d at 470 (citation omitted).  This Court explained:

> To be within the scope of [] employment[,] the [employee's] conduct must
> be of the kind [that] the [employee] is employed to perform[,] must occur
> during a period [that is] not unreasonably disconnected from the authorized
> period of employment[, must occur] in a locality [that is] not unreasonably
> distant from the authorized area, and [must be] actuated[,] at least in part[,]
> by a purpose to serve the [employer].

Id. at 255, 587 A.2d at 471 (citations omitted).

This Court noted that, to be within the scope of employment, the employee's actions

must be of the same general nature as that which was authorized, or incidental to the

conduct that was authorized, by the employer—regardless of whether the employer

intended or consciously authorized the employee's actions.  See id. at 256, 587 A.2d at

471.  In determining whether the employee's actions, "although not authorized[ by the

employer], [were] nevertheless so similar to[,] or incidental to[,] the conduct [that was]

authorized [by the employer] as to be within the scope of employment," a court must

consider the following ten factors:

> (a) whether or not the act[ions are] commonly done by such [employee]s; (b)
> the time, place[,] and purpose of the act[ions]; (c) the previous relations
> between the [employer] and the [employee]; (d) the extent to which the
> business of the [employer] is apportioned between different [employee]s; (e)
> whether the act[ions are] outside the enterprise of the [employer] or, if within
> the enterprise, ha[ve] not been entrusted to any [employee]; (f) whether or
> not the [employer] has reason to expect that such [] act[ions] will be done;
> (g) the similarity in quality of the act[ions that were] done to the act[ions that

were] authorized[ by the employer]; (h) whether or not the instrumentality by which the harm is done has been furnished by the [employer] to the [employee]; (i) the extent of departure from the normal method of accomplishing an authorized result[;] and (j) whether or not the act[ions are] seriously criminal.

Id. at 256, 587 A.2d at 471 (cleaned up). Restating the factor as to "whether or not the [employer] has reason to expect that such [] act[ions] will be done[,]" this Court noted that a court must consider whether "the employee's [actions were] expectable or foreseeable" from the employer's perspective. Id. at 256, 587 A.2d at 471 (cleaned up).

We stated that an employee's actions are outside the scope of employment where they are "personal, [] where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his [or her] own interests, even if during normal duty hours and at an authorized locality[.]" Id. at 256-57, 587 A.2d at 471 (citations omitted). We observed that where an employee's actions are "unprovoked, highly unusual, and quite outrageous," courts tend to hold that that circumstance, "in itself[,] is sufficient to indicate that the [employee's] motive was a purely personal one[,]" and, that the employee's actions were "outside the scope of employment." Id. at 257, 587 A.2d at 471 (cleaned up). Utilizing these principles, we concluded that, assuming the plaintiffs' allegations were accurate, the defendant acted outside the scope of his public duties during the first encounter. See id. at 257, 587 A.2d at 472.

Specifically, this Court determined that, during the first encounter, "the defendant was acting from personal motives, that such conduct by a [law enforcement] officer would not be expectable, and that [the defendant] was in no way furthering the State's interests." Id. at 260, 587 A.2d at 473. This Court explained that the following circumstances

indicated that the defendant's actions during the first encounter were outside the scope of employment:

> The defendant was off duty and driving his personal car. . . . [T]he defendant[] throwing a rock at the plaintiffs' car[,] and his attack upon the plaintiffs[,] . . . had nothing to do with the defendant's duties as a [law enforcement] officer.  As to that activity, there is no suggestion . . . that [the defendant] was attempting to question, stop, detain[,] or arrest the plaintiffs in connection with any traffic or criminal offense[,] or any other matter of concern to the [Maryland State Police].  [To] the contrary, . . . [the defendant] was acting for purely personal reasons[,] and not incidental to any State law enforcement purpose.

Id. at 257-58, 587 A.2d at 472.

In contrast, we concluded that the trial court should not have decided, at the motion to dismiss stage, the issue of whether the defendant acted within the scope of employment during the second encounter.  See id. at 260-61, 587 A.2d at 473-74.  We noted that the issue as to the second encounter was "less clear" than the issue as to the first encounter.  See id. at 260, 587 A.2d at 473.  We observed that, "[o]rdinarily[,] when stopping a motorist[,] or making[,] or attempting to make[,] an arrest, a [law enforcement] officer is acting within the scope of [] employment."  Id. at 260, 587 A.2d at 473.  We discussed the holding in Cox, 296 Md. at 170-171, 460 A.2d at 1042-43, in which this Court determined "that the scope of employment issue was for the jury[,] and should not have been resolved by" granting a motion to dismiss.  Sawyer, 322 Md. at 261, 587 A.2d at 473.  Ultimately, in Sawyer, id. at 261, 587 A.2d at 473-74, we concluded that the trial court should not have decided on a motion to dismiss whether or not the defendant's alleged actions during the second encounter (the encounter in which the arrest was made) were within the scope of employment.

- 24 -

Four days after issuing its opinion in Sawyer, this Court issued its opinion in Ennis, 322 Md. at 295-96, 289-90, 587 A.2d at 490-91, 487-88, in which this Court held that a trial court erred in granting a motion to dismiss a complaint in which the plaintiff alleged that the defendant, a member of a county council, defamed her. This Court held that the defendant did not act in the scope of her duties as a council member when she accused the plaintiff, the president of a civic group, of attempting to bribe her; thus, it was not necessary for the county to be notified of the defamation action under the LGTCA. See id. at 288, 294, 296, 587 A.2d at 486-87, 490, 491. In the complaint, the plaintiff alleged the defendant falsely told a newspaper reporter that the plaintiff had offered to pay the defendant's campaign's debts if the defendant voted against a proposed development plan. See id. at 288-89, 587 A.2d at 487. Three newspapers reported the plaintiff's alleged offer of a bribe. See id. at 288, 587 A.2d at 486-87.

The plaintiff sued the defendant for libel and slander. See id. at 289, 587 A.2d at 487. The defendant moved to dismiss, contending that dismissal was necessary because the plaintiff had failed to notify the county of the case, as required by the LGTCA. See id. at 289-90, 587 A.2d at 487-88. The defendant argued that the LGTCA applied to the case because she acted within the scope of employment when she spoke to the reporter. See id. at 289-90, 587 A.2d at 487. The trial court granted the motion to dismiss, and the plaintiff appealed. See id. at 290-91, 587 A.2d at 488. While the case was pending in the Court of Special Appeals, we issued a writ of *certiorari* on our own initiative. See id. at 291, 587 A.2d at 488.

This Court held that the LGTCA did not apply to the case because, assuming the

plaintiff's allegations were accurate, the defendant acted outside the scope of employment when she spoke to the reporter "for [her] own purposes." Id. at 296, 587 A.2d at 491. This Court determined that the defendant's statement to the reporter was not "in furtherance of the county's business and incidental to it," and "instead[] was in furtherance of [her] interests"—more specifically, "a political act [that was] undertaken for her own benefit." Id. at 294, 587 A.2d at 490. This Court explained:

> It is difficult to understand how [the defendant] could have been fulfilling her duties as a local legislator, or in any way furthering [the c]ounty's business, by publicly accusing [the plaintiff] of offering her money to pay [her] campaign['s] debts . . . to influence her vote on a controversial [proposed] development [plan], when the [allegedly] defamatory [statement] took place [more than two month]s after the alleged bribe[,] and long after the [county] council's vote. It is more reasonable to infer . . . that [the defendant]'s public statements were made to discredit [the plaintiff] and other political opponents . . . to protect [the defendant]'s career as an elected official.
>
> * * *
>
> Although it may be argued that the public derived some benefit from learning that one of its elected officials was allegedly offered a bribe, there is nothing [that is] peculiar to [the defendant]'s job as a county council member [that] created that benefit. Her reporting the alleged bribe to the press, and any benefit to [the c]ounty['s] citizens [that] may have resulted therefrom, were not incidental to [the defendant]'s employment as a local elected legislative official.

Id. at 294-95, 587 A.2d at 490 (citations omitted).

In Wolfe, 374 Md. at 22, 34, 821 A.2d at 53, 60, this Court held that, in raping the plaintiff, a county law enforcement officer acted outside the scope of employment for purposes of the LGTCA. In a Maryland trial court, the plaintiff sued the officer, certain law enforcement officials, and the county, raising federal claims and Maryland ones. See id. at 23, 821 A.2d at 53. The defendants removed the case to a federal trial court. See id.

at 23, 821 A.2d at 53.[7]  The federal trial court conducted a jury trial on the claims against the officer.  See Wolfe, 374 Md. at 23, 821 A.2d at 53.

At trial, there was evidence that the officer initiated a traffic stop of the plaintiff on suspicion that she had been driving while intoxicated.  See id. at 22, 821 A.2d at 53.  The officer told the plaintiff to sit in his police vehicle's passenger seat.  See id. at 22, 821 A.2d at 53.  The officer drove to a parking lot, raped the plaintiff, and drove her home.  See id. at 22, 821 A.2d at 53.  The plaintiff reported the rape.  See id. at 22, 821 A.2d at 53.  The jury returned a verdict in the plaintiff's favor against the officer.  See id. at 23, 821 A.2d at 53.  In a Maryland trial court, the plaintiff sued the county, contending that it was liable for the verdict under the county's self-insurance program and the collective bargaining agreement between the county and its police department.  See id. at 22, 24, 821 A.2d at 53-54.  The Maryland trial court dismissed, or granted summary judgment in the county's favor as to, all of the claims.  See id. at 24, 821 A.2d at 54.  The plaintiff appealed, and the Court of Special Appeals affirmed.  See id. at 25-26, 821 A.2d at 55.

This Court affirmed as well, observing that the "[c]ounty's obligation to pay certain tort judgments against its employees, including county [law enforcement] officers, [was] based on the [LGTCA] and the" county's self-insurance program.  Id. at 34, 821 A.2d at 60.  Under both the LGTCA and the county's self-insurance program, the county was liable only where an employee's tortious actions were "within the scope of employment[.]"  Id.

---

[7]The federal trial court severed the claims against the officer from the claims against the law enforcement officials and the county, and granted summary judgment in favor of the officials and the county.  See Wolfe, 374 Md. at 23, 821 A.2d at 53-54.

at 27-28, 821 A.2d at 56 (citations omitted). We concluded that it was "clear from our cases that" the officer "was not acting within the scope of [] employment." Id. at 34, 821 A.2d at 60 (citing Ennis, 322 Md. at 293-296, 587 A.2d at 489-91; Sawyer, 322 Md. at 254-260, 587 A.2d at 470-73).

In Brown v. Mayor, 167 Md. App. 306, 310, 324, 892 A.2d 1173, 1175-76, 1184, cert. denied, 393 Md. 243, 900 A.2d 749 (2006), the Court of Special Appeals held that, in murdering the plaintiffs' relative, an officer of the Department acted outside the scope of employment under the LGTCA. The plaintiffs had sued the officer, the City, the State, and the Department's Commissioner for wrongful death. See id. at 313, 892 A.2d at 1177. The City, the State, and the Department's Commissioner filed a motion to dismiss the claims against them, which the trial court granted. See id. at 313-14, 892 A.2d at 1177. The plaintiffs filed motions for partial summary judgment, contending that the officer acted within the scope of employment, and that the plaintiffs were entitled to judgment as a matter of law as to liability. See id. at 314, 892 A.2d at 1177-78. The trial court granted the motions, and conducted a jury trial on the amount of damages. See id. at 314, 892 A.2d at 1178.

At trial, there was evidence that the officer learned that his wife was having an affair with one of the plaintiffs' relatives. See id. at 311, 892 A.2d at 1176. One night, the officer's wife was at the plaintiffs' relative's residence, and the officer was at his residence, getting ready to work a night shift. See id. at 311, 892 A.2d at 1176. The officer put on his Department uniform and drove his personal vehicle to the area of the plaintiffs' relative's residence. See id. at 311-12, 892 A.2d at 1176. At that time, the officer's wife

and the plaintiffs' relative were outside of the residence. See id. at 312, 892 A.2d at 1176.

The officer approached his wife and the plaintiffs' relative, then asked the plaintiffs'

relative: "Didn't I tell you to stay away from my wife?" Id. at 312, 892 A.2d at 1176.

According to the officer, the plaintiffs' relative reached into the officer's wife's vehicle,

and the officer thought that the plaintiffs' relative was reaching for something. See id. at

312, 892 A.2d at 1177. The officer pulled out his service weapon and shot the plaintiffs'

relative seventeen times, killing him. See id. at 312, 892 A.2d at 1176. In a criminal case,

the officer pled guilty to first-degree murder. See id. at 312, 892 A.2d at 1176.

After the jury trial on damages in the civil case, the plaintiffs sued the City and the

Department, contending that they were liable for the judgment against the officer. See id.

at 315, 892 A.2d at 1178-79. The trial court granted summary judgment in the City's and

the Department's favor, finding that the LGTCA did not apply. See id. at 316-17, 892 A.2d

at 1179. The plaintiffs appealed. See id. at 317, 892 A.2d at 1179.

The Court of Special Appeals affirmed, concluding that the LGTCA did not apply

because the officer acted outside the scope of employment. See id. at 326-27, 892 A.2d at

1185. The Court of Special Appeals explained:

> As in [Sawyer, 322 Md. 247, 587 A.2d 467, and Wolfe, 374 Md. 20,
> 821 A.2d 52], [the officer] was not acting pursuant to his duties as a
> [Department] officer[,] or in any way related to that position[,] when he
> murdered [the plaintiffs' relative]. Instead, his actions were completely
> personal. The facts make plain that [the officer] was upset about his wife's
> affair with [the plaintiffs' relative]. With planning, he approached [the
> plaintiffs' relative] with the intention of causing him harm. [The officer] was
> not on duty, but was readied for work. He did not act in self-defense[—]he
> stated . . . that he just did not know what came over him[—]but shot [the
> plaintiffs' relative] with malice[] seventeen times. Even if he subjectively
> thought he was acting in self-defense, he did not act reasonably in shooting

- 29 -

[the plaintiffs' relative] to death, simply because [the plaintiffs' relative] reached inside the car that was owned by [the officer] and his wife. [The officer's] tortious act was precisely the type of "highly unusual" and "quite outrageous" one that falls outside the scope of employment[] as a matter of law. That [the officer] was wearing his [] uniform at the time of the shooting[,] and shot [the plaintiffs' relative] with his service weapon[,] did not transform an otherwise personal act into one that was furthering [the Department]'s business.

Brown, 167 Md. App. at 324-25, 892 A.2d at 1184.

Four years after the Court of Special Appeals's holding in Brown, in Houghton v. Forrest, 412 Md. 578, 582-83, 592, 989 A.2d 223, 226, 231 (2010), this Court held that, in causing the respondent to be arrested, the petitioner, an officer of the Department, acted within the scope of employment for purposes of the LGTCA. The respondent sued the petitioner and the arresting officer for multiple causes of action, including false arrest and false imprisonment. See id. at 584, 989 A.2d at 227. The trial court conducted a jury trial. See id. at 584, 989 A.2d at 227.

In that case, while watching a security camera's feed, the petitioner saw a drug dealer sell drugs to a man and a woman. See id. at 583, 989 A.2d at 226. The petitioner instructed two other officers to arrest the drug dealer and the two buyers. See id. at 583, 989 A.2d at 226. The two other officers arrested the drug dealer and the male buyer, but did not see anyone matching the woman's description. See id. at 583, 989 A.2d at 226. While continuing to watch the security camera's feed, the petitioner saw the woman who had purchased the drugs hug another woman, who had a black jacket, dark jeans, and a red umbrella. See id. at 583, 989 A.2d at 226. The petitioner believed that the purpose of the hug was to hide the transfer of drugs. See id. at 583, 989 A.2d at 226. The petitioner lost

sight of the woman who purchased the drugs and the woman whom she had hugged because he moved the security camera so that he could resume watching the other two officers arrest the drug dealer and the male buyer. See id. at 583, 989 A.2d at 226.

The petitioner used the security camera to search the area for the two women. See id. at 583, 989 A.2d at 226. The petitioner did not see the buyer, but saw the respondent standing at a nearby bus stop. See id. at 583, 989 A.2d at 226. The petitioner believed that the respondent was the woman whom the buyer had hugged. See id. at 583, 989 A.2d at 226. Although the respondent had on different colored pants and jacket, she had a red umbrella, as did the woman the buyer had hugged. See id. at 583, 989 A.2d at 226.

The petitioner instructed one of the other officers to arrest the respondent. See id. at 583, 989 A.2d at 226. The other officer approached the respondent and asked her whether she had anything illegal on her person. See id. at 583, 989 A.2d at 226. The respondent replied in the negative, and consented to a search, which did not reveal anything illegal. See id. at 583, 989 A.2d at 226. Nonetheless, the petitioner instructed the other officer to arrest the respondent. See id. at 583, 989 A.2d at 226. The other officer suggested that the petitioner review the video footage to make certain that the respondent was the woman who had hugged the buyer. See id. at 583, 989 A.2d at 226. The petitioner did not do so and insisted that the other officer arrest the respondent. See id. at 583-84, 989 A.2d at 226. The other officer did so. See id. at 584, 989 A.2d at 227. The respondent was never summoned to court, and the charges against her were eventually dismissed. Id. at 584, 989 A.2d at 227.

At trial, the respondent testified that she overheard the arresting officer say that he

may have arrested the wrong person, and that he had been instructed to arrest her anyway. See id. at 584, 989 A.2d at 227. The jury found that the arresting officer was immune from liability, that the petitioner was not immune because he had acted with actual malice, and that the petitioner was liable on almost all counts. See id. at 584, 989 A.2d at 227. The petitioner appealed, and the Court of Special Appeals held that, although the evidence was insufficient to support a finding of malice, the Department was liable for the judgment against the petitioner. See id. at 584, 989 A.2d at 227.

This Court affirmed in part and reversed in part.[8] See Houghton, 412 Md. at 593, 989 A.2d at 232. This Court agreed with the Court of Special Appeals that the Department was liable for the judgment against the petitioner. See id. at 593, 989 A.2d at 232. This Court observed that, under CJ § 5-303(b)(1), generally, "'a local government shall be liable for any judgment against its employee for damages resulting from tortious acts' within the [] scope of employment." Id. at 592, 989 A.2d at 231. Addressing the case's circumstances, this Court determined that the petitioner acted within the scope of employment because his decision to cause the respondent to be arrested "was incident[al]

---

[8]This Court concluded that, contrary to the decision of the Court of Special Appeals, it was unnecessary to determine whether the evidence was sufficient to support the jury's finding that the petitioner had acted with actual malice. See Houghton, 412 Md. at 593, 989 A.2d at 232. This Court cited CJ § 5-302(b)(2), which provides that, where a local government's employee is found to have acted with actual malice, the local government may seek indemnification from its employee. See id. at 592, 989 A.2d at 232. This Court explained that "the legal relationship between [the petitioner] and the" Department—which was not a party to the case—was "not at issue[.]" Id. at 592, 989 A.2d at 232. This Court noted that, if the Department sought indemnification from the petitioner in a subsequent case, "an assessment of [his actual] malice[,] or lack thereof[, could] be addressed during those proceedings." Id. at 592, 989 A.2d at 232.

to his general authority as a [law enforcement] officer." Id. at 592, 989 A.2d at 231.

In Clark v. Prince George's Cty., 211 Md. App. 548, 577, 570-71, 65 A.3d 785, 802, 798, cert. denied, 434 Md. 312, 75 A.3d 318 (2013), the Court of Special Appeals held that, in shooting delivery people at his residence, a law enforcement officer acted outside the scope of employment for purposes of the doctrine of *respondeat superior*. One of the delivery people died at the scene, while the other suffered permanent physical injuries. See id. at 553, 65 A.3d at 788. The injured delivery person, as well as the personal representatives of the deceased delivery person's estate, sued the county and the officer. See id. at 553, 65 A.3d at 788.

The officer, who worked in an administrative position at a county police department, took time off work so that he could be at home for a furniture delivery. See id. at 554-55, 65 A.3d at 789. Two delivery people arrived, and the officer escorted them upstairs to the master bedroom while his wife and daughter remained in the kitchen. See id. at 555, 65 A.3d at 789. According to the officer, once he was in the master bedroom, only one of the delivery people was with him, and he heard a noise coming from his daughter's bedroom. See id. at 563, 65 A.3d at 793. The officer asked where the other delivery person was, and the one in the master bedroom responded: "[D]on't worry about it, Shorty, I got him." Id. at 563, 65 A.3d at 793-94.

Shortly afterward, the officer saw the other delivery person stick his head out of the officer's daughter's bedroom, and the officer told the delivery people to leave. See id. at 563-64, 65 A.3d at 793-94. According to the officer, the delivery people did not leave, and he told them to leave several more times. See id. at 564, 65 A.3d at 794. According to the

officer, both of the delivery people punched him and tried to beat him. See id. at 565, 65 A.3d at 795. Using his service weapon, the officer shot both of the delivery people. See id. at 565-66, 65 A.3d at 795. The officer telephoned 911, identified himself as a law enforcement officer, provided his identification number, put on his badge, and eventually completed a "Use of Force Report[.]" Id. at 566, 65 A.3d at 795. At trial, upon being asked why he fired his service weapon, the officer testified: "I did that to save my life, to protect myself from being beat up in my own home, or possibly severely injured or killed, and [there were] two strange men in my home with my wife and daughter. I did what any homeowner would do." Id. at 566, 65 A.3d at 795.

The trial court granted judgment in the county's favor on the ground that the officer acted outside the scope of employment. See id. at 554, 65 A.3d at 788. The injured delivery person and the personal representatives of the deceased delivery person's estate appealed. See id. at 553, 65 A.3d at 788. The Court of Special Appeals affirmed, agreeing with the trial court that the officer acted outside the scope of employment. See id. at 590, 578-79, 65 A.3d at 810, 803.

In Morales, 230 Md. App. at 702-03, 704-05, 149 A.3d at 742-43, 744, the Court of Special Appeals held that there was sufficient evidence for a jury to decide whether a county law enforcement officer acted within the scope of employment for purposes of the doctrine of *respondeat superior* where a college fraternity hired the officer to provide security at a Halloween party and the officer allegedly punched a partygoer and put him in a chokehold. In a Maryland trial court, the plaintiff (the partygoer) sued the officer and the county, raising federal claims and State ones. See Morales, 230 Md. App. at 701, 149 A.3d

at 742. The county removed the case to a federal trial court, which dismissed the federal claims and remanded to the Maryland trial court for disposition of the State claims. See id. at 701, 149 A.3d at 742. The Maryland trial court conducted a jury trial. See id. at 702, 149 A.3d at 742.

There was evidence that at the time of the Halloween party, the officer was restricted to light duty because of a recent knee surgery and was not authorized to work outside the county police department. See id. at 708, 149 A.3d at 746. The officer did not seek authorization to, or notify his supervisors that he would, provide security at the party. See id. at 708, 149 A.3d at 746. The officer recruited several other officers to help provide security at the party. See id. at 703, 149 A.3d at 743. The officer drove his personal vehicle to the party, while other officers drove police vehicles to the party. See id. at 703, 149 A.3d at 743. Although the officer was off duty, he wore his duty belt, service weapon, handcuffs, badge, bulletproof vest, uniform shirt with the county police department's initials on it, and other police gear. See id. at 708, 703, 149 A.3d at 746, 743. At the party, the officer supervised all of the other officers and security personnel. See id. at 703, 149 A.3d at 743. The party's venue, a warehouse, reached capacity, and a crowd formed in front of the entrance. See id. at 703, 149 A.3d at 743. At the officer's direction, in an attempt to disperse the crowd, the other officers intermittently activated the police vehicles' sirens. See id. at 703, 149 A.3d at 743.

The plaintiff, who had bought a ticket to the party, arrived and spent forty-five minutes waiting in the crowd. See id. 703, 149 A.3d at 743. Once the plaintiff reached the area of the warehouse's entrance, he held up his ticket and asked the officer for help. See

- 35 -

id. 704, 149 A.3d at 743. The officer told the plaintiff to get back in line, but there was not one. See id. 704, 149 A.3d at 743. According to the plaintiff, he again asked the officer for help, and, this time, the officer held his neck and punched him in the mouth. See id. at 704-05, 149 A.3d at 743-44. The plaintiff testified that he fell to the ground, and that the officer put him in a chokehold. See id. at 705, 149 A.3d at 744. Although the officer's version of events differed from the plaintiff's—mainly, the officer alleged that the plaintiff physically attempted to get past him to enter the party after having been told that no one else would be allowed in—the officer acknowledged that he punched the plaintiff in the face, pinned him to the ground, and held the plaintiff with his arm. See id. at 705-06, 149 A.3d at 744-45. The officer did not arrest the plaintiff, but prepared "a use of force report" concerning the altercation. Id. at 707, 149 A.3d at 745.

The jury found the officer and the county liable. See id. at 702, 149 A.3d at 742. The county moved for judgment notwithstanding the verdict, contending that it was not liable because the officer acted outside the scope of employment. See id. at 702, 149 A.3d at 742. The trial court denied the motion for judgment notwithstanding the verdict. See id. at 702, 149 A.3d at 742. The county appealed. See id. at 702, 149 A.3d at 742.

The Court of Special Appeals affirmed. See id. at 734, 149 A.3d at 761. The Court of Special Appeals concluded that "there was sufficient evidence to generate a jury question as to whether [the officer] took police action against [the plaintiff], and therefore was acting within the scope of [] employment." Id. at 727, 149 A.3d at 757. Applying the scope of duty factors identified in Sawyer, the Court of Special Appeals explained:

> On this record, there was evidence that [the officer]'s conduct was

- 36 -

> "the kind" he was "employed to perform" for the [county police department], that it "occur[red] during a period not unreasonably disconnected from the authorized period of employment," "in a locality" where he was authorized to take police action, and that it was "actuated at least in part by a purpose to serve" the [c]ounty. [] *Sawyer*, 322 Md. at 255, 587 A.2d [at 471]. That was sufficient for the jury to find by a preponderance of the evidence that, even if [the officer]'s crowd control duties were within the scope of [] employment by the fraternity, his actions during his altercation with [the plaintiff] were within the scope of [] employment[ by the county police department].

Morales, 230 Md. App. at 729-30, 149 A.3d at 758-59 (some alterations in original). The Court of Special Appeals declined to hold that the officer's use of force was outside of the scope of his employment as a matter of law on the ground that, at the time of the incident, he was on light-duty status. See id. at 727, 149 A.3d at 757.

Having discussed Maryland case law on scope of employment, we observe that both Potts and James's estate rely on Titan Indem. Co. v. Newton, 39 F. Supp. 2d 1336 (N.D. Ala. 1999), a case involving circumstances comparable to those of their cases—*i.e.*, fabrication of evidence and false imprisonment. The federal case involved Alabama case law concerning the scope of employment, which is substantially similar to Maryland case law on that subject. Compare id. at 1342, with Sawyer, 322 Md. at 255, 257, 587 A.2d at 470, 471. In Titan Indem., 39 F. Supp. 2d at 1338, in the United States District Court for the Northern District of Alabama, a city's insurer initiated a declaratory judgment action seeking a ruling that it was not required to pay a $2,300,000 judgment against the city and a police officer resulting from a separate civil action alleging that the police officer fabricated evidence against two people which led to their conviction and imprisonment on federal drug charges. In ruling on motions for summary judgment, the District Court concluded that the officer acted within the scope of employment when fabricating evidence

against the two people.  See id. at 1349, 1343.

In a prior case, the two people had sued the city and several of its police department's officials for, among other causes of action, fabrication of evidence, failure to train and supervise, malicious prosecution, and false imprisonment.  See id. at 1338.  In the complaint, the two people alleged that the officer, who was the head of a police department's narcotics unit, fabricated evidence against them, which led to them being convicted of federal drug charges.  See id.  The case proceeded to a jury trial, at which another officer testified that the officer who was head of the narcotics unit admitted that he had fabricated evidence to secure convictions.  See id. at 1342.  Specifically, the officer testified that the head of the narcotics unit asked him: "Do you know how we won the [criminal] case . . .?"  Id.  The officer answered: "No."  Id.  The head of the narcotics unit responded in pertinent part: "[I]t wasn't nothing but sage and eggs, I took the marijuana and rubbed it in."  Id.  The jury returned verdicts against the city as to a claim for failure to train and supervise, and against the head of the narcotics unit as to claims for fabrication of evidence, malicious prosecution, and false imprisonment.  See id. at 1338.  At the time of the verdicts, a contract between the city and an insurance company was in effect, which required the insurance company to pay judgments that resulted from actions by the city's law enforcement officers that were within the scope of their duties.  See id. at 1339.

The insurance company sought a declaratory judgment that the contract did not obligate it to pay the judgment in the prior case because, among other matters, the officer was not acting within the scope of employment in fabricating evidence.  See id. at 1338-39.  The two people counterclaimed for breach of contract, bad faith, and negligence.  See

id. at 1338.  The insurance company and each of the people filed separate motions for

summary judgment.  See id. at 1349.

The District Court granted the two individuals' motions for summary judgment and

denied the insurance company's motion for summary judgment.  See id. at 1349.  The

District Court observed:

> Under Alabama law, an employee's acts are within the scope of his [or her] employment if the acts are so closely connected with what the [employee] is employed to do[,] and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.  Of course, where an employee's behavior is the result of, or impelled by, wholly personal motives, it cannot be said that the employee's actions are within the . . . scope of [] employment[.]

Id. at 1342 (cleaned up).  The District Court noted that there are few bright lines where the

analysis of scope of employment issues is concerned, but it is clear that an officer acts

outside the scope of employment when sexually assaulting an arrestee, whereas an officer

acts within the scope of employment when using excessive force on an arrestee.  See id.

In granting the two individuals' motions for summary judgment, the District Court

explained:

> [T]he actions of [the head of the narcotics unit] in fabricating evidence against [the two individuals] is far closer to a[n] officer's use of excessive force than it is to the sexual assault of an arrestee.  There is no principled difference between fabricating evidence and using excessive force to summarily punish a suspect or to extract a confession.  In addition, there is not one jot, speck[,] or iota of evidence before the court from which it could be found or inferred that [the head of the narcotics unit] was pursuing a private motive when he fabricated the evidence against [the two individuals]. Indeed, the uncontradicted evidence before the court is that [the head of the narcotics unit] fabricated the evidence as part of his duties to arrest[,] and assist in the prosecution of[,] drug dealers.  As previously noted, [he] was in charge of narcotics enforcement for the . . . [p]olice [d]epartment at the time

of his unlawful action. . . . [A]n officer who plants evidence acts [with]in the scope of [] employment[.]

Id. at 1343.

**Analysis**

Here, we hold that, in Potts and James, the officers acted within the scope of employment, and, under CJ § 5-303(b)(1), the City is responsible for compensating Potts and James's estate for the officers' actions by paying the settlements that Potts, James's estate, and the officers reached. We determine that the stipulations in Potts and James demonstrate that the officers' conduct in each case satisfies the test for conduct within the scope of employment that this Court set forth in Sawyer, 322 Md. at 255-57, 587 A.2d at 470-71. We conclude that the circumstances of Potts and James are analogous to cases in which Maryland appellate courts have determined that government employees acted within the scope of employment, and are distinguishable from cases in which Maryland appellate courts have determined that government employees acted outside the scope of employment.

Our conclusion that the officers acted within the scope of employment does not mean that we in any way condone the officers' misconduct, or that it is at all acceptable for law enforcement officers to act as these officers did. The officers' misconduct was egregious, and no citizen should ever be subjected to such an abuse of power by law enforcement officers. The issue that is before us, though, is not whether the officers' conduct was wrongful; it clearly was. Instead, the issue is whether the City and the Department are responsible for the officers' actions because their actions were within the

scope of employment. We determine that the officers' actions were within the scope of employment, and that the City and the Department must compensate Potts and James's estate.

In determining whether an employee acted within the scope of employment, a court must engage in a case-specific analysis—*i.e.*, resolve the issue on a fact-intensive, case-by-case basis. Indeed, within Maryland case law regarding scope of employment, "there are few, if any, absolutes." Sawyer, 322 Md. at 255, 587 A.2d at 471. Like the United States District Court for the Northern District of Alabama, though, we agree that it is evident that where an officer sexually assaults a suspect in custody, the officer does not act within the scope of employment, and where an officer uses excessive force, the officer may be acting within the scope of employment. See Titan Indem., 39 F. Supp. 2d at 1342-43. Between these opposite ends of the spectrum, in Maryland, the constant is that the test enunciated by this Court in Sawyer is accepted as the framework for analyzing whether an officer acted within the scope of employment.

The stipulations in Potts and James do not mention Sawyer, much less indicate whether Potts's and James's circumstances satisfy the Sawyer test. It is up to us to resolve the question of whether Potts's and James's facts, as they are set forth in the stipulations, satisfy the Sawyer test. We answer that question in the affirmative.

Assessing the first prong of the Sawyer test, we conclude that the officers' actions were in furtherance of the Department's business because they were at least partially motivated by a purpose to serve the Department, and because there is no indication that the officers were "acting to protect [their] own interests[.]" Sawyer, 322 Md. at 255-57, 587

A.2d at 470-71 (citations omitted). Undeniably, police activities include stopping, searching, questioning, and arresting individuals, authoring police reports, and testifying against criminal defendants.

"[O]rdinarily[,] when . . . making[,] or attempting to make[,] an arrest, a [law enforcement] officer is acting within the scope of [] employment." Id. at 260, 587 A.2d at 473. In Sawyer, id. at 260-61, 587 A.2d at 473-74, this Court concluded that a trial court should not have decided, at the motion to dismiss stage, the issue of whether an officer acted within the scope of employment where the officer hit a person and had the person arrested. In Houghton, 412 Md. at 592, 989 A.2d at 231, this Court concluded that the officer's arrest of the wrong person "was incident to his general authority as a police officer" and therefore within the scope of employment. In Cox, 296 Md. at 171, 164, 460 A.2d at 1043, 1039, a case involving the doctrine of *respondent superior*, this Court concluded that the officers' actions in allegedly falsely arresting a person were "within the scope and in furtherance of the [employer]'s business and the harm complained of was foreseeable." Given this Court's holdings in Sawyer, Houghton, and Cox, even though the officers engaged in what can only be described as egregious conduct, the circumstance that the misconduct occurred while the officers in the instant cases were making arrests favors concluding that the officers acted within the scope of employment.

Sawyer and Houghton demonstrate that, generally, an officer's arrest of a person may be within the scope of employment, even if the arrest is not supported by probable cause. In both Sawyer and Houghton, this Court described facts that established that there was no evidence that the people arrested had committed any crimes and/or were the

- 42 -

subjects of arrest warrants. In <u>Sawyer</u>, 322 Md. at 251-52, 261, 587 A.2d at 469, 474, as to an incident involving an alleged assault and battery in which a motorist was arrested (during the second encounter), this Court determined that whether the officer's alleged actions were within the scope of his employment should not have been decided on a motion to dismiss. In <u>Houghton</u>, 412 Md. at 583-84, 989 A.2d at 226-27, the evidence not only failed to indicate that the person arrested had committed any crimes and/or was the subject of an arrest warrant, but also showed that the person was arrested because she was mistaken for someone else.

Here, as in <u>Sawyer</u> and <u>Houghton</u>, the circumstance that the officers lacked probable cause or an arrest warrant does not change the circumstance that they were engaging in a police activity. Indeed, the stipulations indicate that, despite being illegal, the officers' arrests of Potts and James appeared, to the criminal justice system, to be valid for months. In other words, as the City's and the Department's counsel acknowledged at oral argument, "the appearances were that [the officer]s were making good arrests."

Like a lack of probable cause for an arrest, excessive force does not necessarily render an officer's arrest of an individual outside the scope of employment. In <u>Cox</u>, 296 Md. at 171, 164, 460 A.2d at 1043, 1039, this Court concluded that the allegation that officers had a police dog bite a person, "'in clear and substantial excess of the force needed to restrain and detain' him," failed to indicate that the officers acted outside the scope of employment. In <u>Morales</u>, 230 Md. App. at 702-03, 149 A.3d at 742-43, the Court of Special Appeals held that there was sufficient evidence for a jury to decide whether an officer acted within the scope of employment while using excessive force against a person.

- 43 -

In <u>Titan Indem.</u>, 39 F. Supp. 2d at 1342, relying on cases from multiple States, the United States District Court for the Northern District of Alabama concluded that an officer who uses excessive force on a person in the course of an arrest may act within the scope of his or her duties. By way of analogy, here, the circumstance that the officers beat Potts does not establish that their actions were outside the scope of employment.

Similarly, the circumstance that the officers attempted to plant handguns on Potts and James does not render automatically their actions outside the scope of employment. <u>Titan Indem.</u> is instructive. In <u>Titan Indem.</u>, <u>id.</u> at 1343, the United States District Court for the Northern District of Alabama held that the head of a narcotics unit acted within the scope of employment when fabricating evidence, *i.e.*, planting drugs on two people. The District Court noted that there was no evidence that the head of the narcotics unit planted the drugs to serve his own interests. <u>See</u> <u>id.</u> The District Court explained that, to the contrary, the evidence showed that the head of the narcotics unit planted the drugs "as part of his duties to arrest[,] and assist in the prosecution of[,] drug dealers." <u>Id.</u> Just as the head of the narcotics unit in <u>Titan Indem.</u> had responsibility for drug-related arrests, the officers in <u>Potts</u> and <u>James</u>, who were members of the Department's Gun Trace Task Force, were responsible for gun-related arrests. Similar to the circumstances of <u>Titan Indem.</u>, the stipulations, in <u>Potts</u> and <u>James</u>, include no evidence that in these two instances, which are not a part of the federal prosecutions, the officers attempted to plant the handguns to serve their own interests, or that the officers' motives were anything other than to arrest. In the absence of such evidence, we cannot say that the officers acted outside the scope of employment.

Just as Potts and James are analogous to Sawyer, Cox, Houghton, Morales, and Titan Indem., they are distinguishable from cases in which Maryland appellate courts have determined that government employees acted outside the scope of employment by serving their own interests. In Ennis, 322 Md. at 294, 587 A.2d at 490, a member of a county council defamed someone for political purposes. In Brown, 167 Md. App. at 310, 324, 892 A.2d at 1175, 1184, an officer murdered someone with whom his wife was having an affair. In Wolfe, 374 Md. at 22, 34, 821 A.2d at 53, 60, an officer raped the subject of a traffic stop. In Clark, 211 Md. App. at 577, 65 A.3d at 802, an officer shot delivery people at his residence. And, in Sawyer, 322 Md. at 257-58, 260, 587 A.2d at 472, 473, during an encounter that occurred before the encounter in which a person was arrested, the officer threw a rock at a vehicle that two people were in, beat one of them, and threatened the other. What Ennis, Brown, Wolfe, Clark, and the first encounter in Sawyer have in common is that the government employees were serving their own interests, not those of the governments that employed them.

In contrast to the facts of Ennis, Brown, Wolfe, Clark, and the first encounter in Sawyer, the stipulations in Potts and James contain no indication that the officers were serving their own interests in arresting Potts and James. To be sure, the officers in Potts and James were charged in a federal conspiracy concerning their misconduct in other cases but, here, there is no evidence that they, like the county council member in Ennis, 322 Md. at 294, 587 A.2d at 490, were motivated by political or personal considerations, or had an overarching goal that superseded making the arrests. There is no evidence that the officers in Potts and James, like the officer in Brown, 167 Md. App. at 324, 892 A.2d at 1184, were

- 45 -

motivated by a desire for revenge.  There is no evidence that the officers in Potts and James, like the officer in Wolfe, 374 Md. at 22, 821 A.2d at 53, committed a sexual offense.  There is no evidence that the officers in Potts and James, like the officer in Clark, 211 Md. App. at 577, 65 A.3d at 802, were attempting to protect themselves or their families.  Unlike the trooper during the first encounter in Sawyer, 322 Md. at 257-58, 587 A.2d at 472, the officers in Potts and James made arrests.  And, critically, the stipulations do not indicate that any of the officers took any cash, drugs, guns, or anything else of value from Potts or James.

That circumstance alone materially distinguishes the officers' misconduct in Potts and James from the conspiracy for which the officers were prosecuted in federal court.  The stipulations in Potts and James include descriptions of twenty-eight incidents involving victims of the conspiracy—individuals other than Potts and James.  In each incident, some of the officers seized cash, drugs, and/or other personal property that had belonged to a person with whom they interacted.  In each incident, the officers kept some or all of the cash and drugs for themselves, rather than submitting all of the cash and drugs at the Department's headquarters as evidence.  By contrast, here, the officers received nothing of value from Potts or James.

Indeed, the plain language of the stipulations states that the federal prosecution of the officers was exclusively based on incidents that involved people other than Potts and James.  No event involving Potts or James was included in any stipulation of fact, plea agreement, pre-sentence report, or other document in connection with the federal prosecutions of the officers.  Consistent with the plain language of the stipulations, and

contrary to the position of the City and the Department, the officers' actions involving Potts and James were not part of, or in furtherance of, the conspiracy of which the officers were charged and convicted in federal court.[9]

Our conclusion is unchanged by the circumstance that Taylor, one of the officers, told James that he would let James go if James provided the name of a person who possessed guns or drugs. To be sure, this is similar to how, in one of the incidents that the stipulations describe, Jenkins (another one of the officers) told R.H. (a victim of the federal conspiracy) that, if he provided the name of a drug dealer whom the officers could rob, the officers would "take care" of R.H., and possibly provide him with drugs to sell. Taylor's statement to James, though, does not establish that the officers' actions with regard to James were in furtherance of the federal conspiracy and/or the officers' own interests, as opposed to being in furtherance of the Department's business. The stipulation does not indicate that the officers sought information from James to identify a drug dealer whom they might rob. Rather, the stipulation indicates that James did not provide names of any drug dealers, and the stipulation does not indicate that any of the officers took anything of value from James. As members of this Court pointed out during oral argument, and as the City's and the Department's counsel agreed, asking others about individuals who possess guns or drugs is an example of the police activity of intelligence-gathering to further law

_____

[9]We are aware that, in the stipulation in James, the facts that are specific to that case appear under the following heading: "Specific Agreed Facts as to the [Officer]s' Actions In Respect to [] James on August 18, 2016, During and in Furtherance of the Racketeering Conspiracy[.]" (Some capitalization omitted). To the extent that the heading indicates that the officers' actions against James were in furtherance of the conspiracy, the content of the stipulations demonstrates otherwise.

enforcement goals.

We are unpersuaded by the City's and the Department's reliance on the following language in Sawyer, 322 Md. at 257, 587 A.2d at 471: "[W]here the conduct of the [employee] is unprovoked, highly unusual, and quite outrageous, courts tend to hold that this in itself is sufficient to indicate that the motive was a purely personal one[,] and [that] the conduct [is] outside the scope of employment." (Cleaned up).  This language does not establish a hard-and-fast rule. Instead, the language is an observation about the type of conduct that Courts have been inclined to determine to be outside of the scope of employment.[10]  Yet, in their reply brief in Potts, the City and the Department go so far as to suggest that there is a "bright[-]line" rule "that intentional, seriously criminal willful conduct — which is unprovoked, highly unusual, and outrageous — is never within the scope of employment."  Such a bright-line rule would be inconsistent with the teaching that, to determine whether an employee acted within the scope of employment, a court must engage in a case-specific analysis—i.e., resolve the issue on a fact-intensive, case-by-case basis.  See Sawyer, 322 Md. at 255, 587 A.2d at 471.  Indeed, in Sawyer, id. at 257, 587 A.2d at 471, this Court did not purport to set forth any kind of bright-line rule for determining that conduct is outside the scope of employment.

Having concluded that Potts's and James's circumstances satisfy the first prong of

---

[10]For example, the conduct of the officers in Potts and James was a far cry from the conduct in a case like Brown, 167 Md. App. at 324, 892 A.2d at 1184, where the Court of Special Appeals explained that an officer's murder of a person with whom the officer's wife was having an affair "was precisely the type of 'highly unusual' and 'quite outrageous' [act] that falls outside the scope of employment[] as a matter of law."

the <u>Sawyer</u> test, we turn to the second prong, which concerns whether the employer authorized the employee's actions. <u>See</u> <u>Sawyer</u>, 322 Md. at 255, 587 A.2d at 470. Certainly, the Department did not expressly authorize the officers' misconduct involving Potts and James. Conduct may nonetheless be considered authorized where it was "incident[al] to the performance of the duties" that the employer entrusted to the employees. <u>Id.</u> at 255, 587 A.2d at 470 (cleaned up). In <u>Sawyer</u>, <u>id.</u> at 256, 587 A.2d at 471, this Court set forth ten factors for determining whether an employee's actions were incidental those that the employer authorized. Weighing the factors leads to the conclusion that the officers' misconduct was incidental to actions authorized by the Department.

An assessment of the factors concerning "whether or not the act[ions are] commonly done by such [employee]s" and "the time, place[,] and purpose of the act[ions]" weighs in favor of a determination that the officers' action were within the scope of employment. <u>Id.</u> at 256, 587 A.2d at 471 (citation omitted). In the stipulations, there is evidence that the officers' conduct was of the type that they were hired to routinely perform—namely, making stops and arrests—and the conduct occurred during a period of time in which the officers were working as on-duty police officers in the jurisdiction in which they were authorized to serve. The officers' actions appear to consist of police activities during which the officers engaged in misconduct for the purpose of giving the appearance of making lawful arrests on behalf of the Department. It is hard to conceive that the actions were taken for the officers' own benefit when the officers received nothing of value from Potts and James, had no disagreement or ongoing dispute with Potts and James motivating the misconduct, and the misconduct was not included in the federal racketeering conspiracy.

- 49 -

It is more feasible that the officers took the actions complained of to create the façade of having engaged in the common police activity of making lawful arrests as authorized by the Department. Although appearing to have made a lawful arrest when, indeed, the arrest was the product of misconduct may have had the effect of raising the officers' stature within the Department or giving the appearance that the officers were more productive than they really were, the record does not contain information to support a conclusion that the officers acted for their own personal aggrandizement.

Clearly, the factors concerning whether the actions are commonly done by the officers and the time, place, and purpose of the actions tilt in favor of establishing that the officers' misconduct was authorized. See Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). The officers' misconduct occurred while they were on-duty officers of the Department. The misconduct occurred in Baltimore City, which is the Department's jurisdiction. And, the purpose of the officers' misconduct appeared to be to further the Department's routine business of making arrests.

The factor as to "the previous relations between the [employer] and the [employee]" is a factor that is in equipoise. Id. at 256, 587 A.2d at 471 (citation omitted). This factor does not weigh in favor of, or against, determining that the officers' misconduct is to be considered authorized, as the stipulations do not include any information on the previous relations between the Department and the officers. This factor is of no consequence in the analysis.

The factor as to the "extent to which the business of the [employer] is apportioned between different [employee]s" weighs in favor of determining that the officers'

misconduct is to be considered authorized. Id. at 256, 587 A.2d at 471 (citation omitted). The officers in Potts and James were members of the Department's Gun Trace Task Force, and, within the Department, had a special responsibility for gun-related arrests. According to the Department and the City, in a memorandum of law in support of a motion for summary judgment in Potts, the Gun Trace Task Force "was a notorious specialized unit of plainclothes officers whose ostensible functions and purposes were to identify, arrest, and build legitimate, prosecutable cases against violent offenders in Baltimore City, particularly those who used firearms." Indeed, in two of the officers' plea agreements (Rayam and Jenkins), the officers acknowledged that the Gun Trace Task Force was a specialized unit within the Operational Investigation Division of the Department whose primary mission was "the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses." At the time of the incidents involving Potts, Jenkins was a sergeant of the Gun Trace Task Force, and, at the time of the incident involving James, had become the officer-in-charge of the Gun Trace Task Force. The record demonstrates that responsibility for the investigation and prosecution of firearm offenses in Baltimore City had been entrusted to the Gun Trace Task Force and to the officers in this case and, as such, the factor concerning the extent to which business is apportioned between different employees weighs in favor of concluding that the officers' conduct was authorized.

The factor concerning "whether the act[ions are] outside the enterprise of the [employer] or, if within the enterprise, ha[ve] not been entrusted to any [employee]" is

neutral. Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). Plainly, unlawful actions, such as fabricating evidence and committing perjury, are outside the Department's enterprise. Yet, the officers' conduct here resulted in arrests that were deemed lawful and accepted as part of the Department's business. Overall, some of the officers' actions consisted of misconduct, other actions were ones that the officers are plainly entrusted to perform, and the end result of the officers' actions was that their conduct appeared for a time to have constituted lawful police activity.

The factor as to "whether or not the [employer] has reason to expect that such [] act[ions] will be done" weighs in favor of determining that the officers' misconduct is to be considered authorized. Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). Regardless of whether the Department had actual notice or actual knowledge of the officers' misconduct, their actions were expectable or foreseeable from the Department's administration's perspective. See id. at 256, 587 A.2d at 471. As we have explained, the officers' misconduct involving Potts and James was not part of the federal racketeering conspiracy with which the officers were charged and convicted. The nature and extent of the conspiracy is pertinent, however, to the issue of whether the Department should have known about the officers' misconduct involving Potts and James. The stipulations indicate that the conspiracy was egregious and widespread, and was perpetuated by a number of officers over a considerable period of time. According to the stipulations, eight former members of the Department's Gun Trace Task Force—including all five of the officers who were involved in Potts and/or James—participated in the conspiracy. The stipulations include descriptions of twenty-eight separate incidents, not involving Potts and James, that

- 52 -

were part of the conspiracy. In each incident in the conspiracy, some of the officers unlawfully seized cash, drugs, and/or other personal property from victims of the conspiracy. The earliest incident occurred on March 11, 2014. The latest incident occurred on October 5, 2016. That is a time span of more than two and a half years. And, tellingly, in their opening briefs, the City and the Department readily acknowledge: "Examples of [] members [of the Department's Gun Trace Task Force] planting evidence are abundant." Given the egregiousness of the conspiracy, the length of time of the conspiracy, the number of former members of the Department's Gun Trace Task Force who participated in the conspiracy, and the Department's acknowledgment that examples of members of the Gun Trace Task Force planting evidence were plentiful, it is reasonable to conclude that the Department should have known of the misconduct by former members of the Gun Trace Task Force, whether the conduct involved the victims of the conspiracy or citizens such as Potts and James.[11]

---

[11]In an attempt to distance themselves from responsibility for the officers' misconduct, in their opening briefs, the City and the Department contend that "[p]lanting evidence on innocent individuals (including [Potts and James]) and faking legitimate arrests (including the arrest of [Potts and James]) provided cover for the [officer]s to 'conceal[] their illegitimate and illegal conduct from City officials and from their superiors.'" (Last alteration in original). In making this argument, the City and the Department quote part of one sentence within the stipulations. For context, the two relevant sentences of the stipulations state: "The [officer]s purposefully and willfully and regularly deviated from the legitimate law enforcement aims of the [Department]'s mission [] to enrich themselves through the illegitimate and illegal conduct. The [officer]s accomplished this by concealing their illegitimate and illegal conduct from City officials and from their superiors." The above-quoted sentences are not under the headings within the stipulations that are specific to Potts and James. Instead, the above-quoted sentences are from the first parts of the stipulations, which pertain to the federal prosecutions of the officers. In sum, to the extent that the City and the Department assert that the stipulations

The factor concerning the "similarity in quality of the act[ions that were] done to the act[ions that were] authorized[ by the employer]" weighs in favor of determining that the officers' misconduct is to be considered authorized. Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). Most of the officers' misconduct consisted of taking authorized actions in unauthorized ways, and the officers' misconduct was interwoven with authorized conduct. For example, although stopping a person is authorized, doing so without reasonable articulable suspicion is not. Although arresting a person is authorized, doing so without probable cause or an arrest warrant is not. And, although testifying against a criminal defendant is authorized, testifying falsely is not. The circumstance that the officers' misconduct was inextricably intertwined with authorized actions militates in favor of determining that the officers' misconduct was incidental to the performance of duties entrusted to them by the Department.

The factor as to "whether or not the instrumentality by which the harm is done has been furnished by the [employer] to the [employee]" weighs in favor of determining that the officers' actions were within the scope of employment. Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). It was because the officers in Potts and James were officers, and had the equipment and authority that comes with being officers, that they were able to engage in police misconduct. The stipulations specifically refer to the officers using a police baton and handcuffs during the incident with Potts, and using two Department vehicles during the incident with James. At oral argument, counsel for the City and the

---

indicate that there was no way for them to know of the officers' misconduct in Potts and James, we are not convinced.

- 54 -

Department acknowledged that the officers were wearing uniforms, badges, and guns. As the Court of Special Appeals recognized in Morales, 230 Md. App. at 728, 149 A.3d at 758, the presence of uniforms, badges, and police vehicles helps show that "conduct constitute[s] police action[.]"

The factors concerning "the extent of departure from the normal method of accomplishing an authorized result" and "whether or not the act[ions are] seriously criminal" weigh against determining that the officers' misconduct was within the scope of employment. Sawyer, 322 Md. at 256, 587 A.2d at 471 (citation omitted). Actions such as fabricating evidence and committing perjury are marked departures from the normal methods of engaging in common police activities. And, the officers in Potts and James committed crimes, including false imprisonment and perjury. These factors, while not dispositive, militate against the actions being considered authorized.

At bottom, the majority of the factors that this Court set forth in Sawyer, 322 Md. at 256, 587 A.2d at 471, for determining whether an employee's actions were incidental to those that the employer authorized weigh in favor of determining that the officers' misconduct is to be considered authorized. Most notably, the officers were part of a specialized unit charged with interdicting illegal firearm activities in Baltimore City, and there was no indication that they were acting for their own personal benefit in stopping and arresting Potts and James and in engaging in the associated misconduct. Two factors do not cut either way. And, only two factors weigh against such a determination. We acknowledge that the officers' actions constituted a departure from the normal method of carrying out their duties and were indeed criminal. But, the LGTCA states that a local

government shall be liable for a judgment against an employee resulting from the employee's tortious acts within the scope of employment. See CJ § 5-303(b)(1). The illegality or tortious nature of the employee's actions alone does not establish that the conduct was outside the scope of employment. On balance, consideration of the ten factors warrants the conclusion that the officers' misconduct was incidental to actions that the Department authorized, such as making arrests. As such, Potts's and James's circumstances satisfy both prongs of the Sawyer test—the officers' actions were in furtherance of the Department's business, and the officers' actions were either authorized or incidental to actions that the Department authorized.

Our determination furthers the LGTCA's purposes, which are "to provide a remedy for persons [who are] injured by local government employees, who often have limited resources from which an injured person might collect on a judgment[,]" Beall v. Holloway-Johnson, 446 Md. 48, 76, 130 A.3d 406, 422 (2016) (cleaned up), and to "ensur[e] that the financial burden of compensation is carried by the local government [that is] ultimately responsible for [its employees]' acts[,]" Litz v. Md. Dep't of Env't, 446 Md. 254, 279, 131 A.3d 923, 938 (2016) (cleaned up). In both Potts and James, the plaintiff and the officers agreed to a settlement in the amount of $32,000. Because we hold that the officers acted within the scope of employment, the City and the Department are liable for the settlements under CJ § 5-303(b)(1). Although the stipulations do not expressly refer to the officers' current financial status, the stipulations note that the officers were charged in federal court in 2017, and that all of them either pled guilty or were found guilty at trial. Given these circumstances, as well as the large number of victims of the conspiracy in which the

officers participated, it is reasonable to conclude that, as James's estate counsel indicated at oral argument, the officers would not be able to pay the settlements that they reached with Potts and James's estate. By holding that the officers acted within the scope of employment, we ensure not only that Potts and James's estate have a remedy, but also that the ultimate responsibility for the officers' misconduct rests with the governmental entities that employed and supervised them—namely, the City and the Department.

Our conclusions in Potts and James should not be read to suggest that all former members of the Department's Gun Trace Task Force acted within the scope of employment in all instances. We are not issuing a blanket ruling for all cases involving alleged misconduct by former members of the Department's Gun Trace Task Force. In future cases involving questions of scope of employment as to former members of the Department's Gun Trace Task Force, courts must engage in a case-specific analysis and take into account all relevant considerations—including, if necessary, the ten factors that this Court set forth in Sawyer, 322 Md. at 255-56, 587 A.2d at 471, for determining whether an employee's actions were incidental to those that the employer authorized. To the extent that the City, the Department, Potts, and/or James may have wanted the instant cases to serve as test cases in which we categorically concluded that all alleged misconduct by former members of the Department's Gun Trace Task Force was within, or outside, the scope of employment, we cannot issue such a bright-line rule. Our opinion will undoubtedly provide guidance to courts, counsel, and parties, but we cannot provide an answer for all future cases involving alleged misconduct by former members of the Department's Gun Trace Task Force. Courts must analyze future cases in their own right as questions

concerning scope of employment arise.

For the above reasons, the officers' actions were within the scope of employment, and, under CJ § 5-303(b)(1), the City and the Department are liable for the settlements that Potts, James's estate, and the officers reached.[12]  In <u>Potts</u>, the answer to the certified question of law is "yes."  In <u>James</u>, the circuit court was correct in granting summary judgment in James's estate's favor.

> **IN MISC. NO. 6, CERTIFIED QUESTION OF LAW ANSWERED.  COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**
>
> **IN CASE NO. 51, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. PETITIONER TO PAY COSTS.**

---

[12]At oral argument, the City's and the Department's counsel acknowledged there is no need for us to determine whether the officers in <u>Potts</u> and <u>James</u> acted with malice.  As this Court explained in <u>Houghton</u>, 412 Md. at 591-92, 989 A.2d at 231, malice is immaterial to the issue of whether a local government is liable for a judgment against one of its employees under CJ § 5-303(b)(1).